687 A.2d 669

ACADEMY OF IRM

v.

LVI ENVIRONMENTAL SERVICES, INC.,
f/k/a Diversified Environmental Corp.

No. 3, Sept. Term, 1996.

Court of Appeals of Maryland.

Jan. 16, 1997.

436

George Z. Petros (Nicholas J. Kallis, on brief), Annapolis, for Petitioner.

Jospeh S. Kaufman (Schulman & Kaufman, L.L.C., on brief), Baltimore, for Respondent.

Argued before BELL, C.J., and ELDRIDGE, RODOWSKY, CHASANOW, KARWACKI and RAKER, JJ., and ROBERT C. MURPHY, Judge (retired) Specially Assigned.

RODOWSKY, Judge.

This garnishment on a judgment by default presents two principal issues:

1.   Whether long-arm service of process is effected on a foreign corporation when an apparent agent for the corporation's financial officer signs the certified mail return receipt on which the sender requested restricted delivery to the corporation's financial officer; and

2.   Whether successor liability may be imposed where the "successor" has acquired the assets of the debtor through foreclosure of bona fide security interests purchased for value by the "successor" from the original lenders.

The petitioner, Academy of IRM (IRM), provided bulk sampling and air monitoring services to contractors engaged in asbestos encapsulation and removal. One of the asbestos removal contractors for whom IRM rendered services was Diversified Environmental Group, Inc., a Pennsylvania corpo-

ration (Debtor).[1]  The contracts for the work that IRM was doing for Debtor originated out of Debtor's office at 1075 Taft Street, Rockville, Maryland where Debtor carried on business under the trade name, Desco Insulation Company (the Trade Name).  Because IRM had not been paid by Debtor, IRM had last done work for Debtor in March 1987.  In November 1987 IRM sued in the Circuit Court for Anne Arundel County to recover the balance due on invoices for services rendered for Debtor at a number of job sites in Maryland, the District of Columbia, and Virginia, including work for Debtor at Fort Belvoir, Virginia.

*Facts—Issue I*

When IRM brought suit it named as defendants the Trade Name and the Debtor.  A private process server returned service on the Trade Name by personal delivery to F. Thomas Young at the Rockville address.[2]

IRM undertook to serve process on Debtor by certified mail.  *See* Maryland Code (1974, 1995 Repl.Vol.), §§ 6–103 and 6–304 of the Courts and Judicial Proceedings Article and Maryland Rules 2–121 and 2–124.  Attached to the affidavit of service filed in the circuit court by IRM is the certified mail return receipt.  It reflects that the United States Postal Service was to "[s]how to whom delivered, date, and address-ee's address."  The sender also requested "Restricted Delivery."  The mail was addressed to "Anthony J. Dintino, Controller, Diversified Environmental Group, 30 Gr[e]at Valley Parkway, Malvern, Pennsylvania 19355."  In block "5. Signature—Addressee" the return receipt is signed, as we read it, "Karen L. Reserdiz."  Immediately below that signature, in

---

1.  Debtor was incorporated in Pennsylvania on March 22, 1983, as Diversified Energy Group, Inc., and it changed its name to Diversified Environmental Group, Inc. on September 12, 1986.

2.  One of IRM's exhibits to its complaint was a letter on the letterhead of Desco Insulation Company.  At the foot of the stationery was printed, "Division of Diversified Environmental Group, Inc.," with a Pennsylvania address and telephone number.  The letter on that stationery was signed "F. Thomas Young, Branch Manager."

the block on the receipt designated "6. Signature—Agent," the word "Agent" is circled. The date of delivery was November 25, 1987, and the addressee's address, written in longhand abbreviations, is 30 Great Valley Parkway. The return receipt form contains the following preprinted instruction to the letter carrier: "Always obtain signature of addressee or agent and DATE DELIVERED."

The Debtor did not appear in response to the complaint, either in its true corporate name or under its trade name. In May 1988 Judge Robert H. Heller, Jr. entered an order of default, but he specifically limited the order submitted by counsel for IRM to the Trade Name only. In an accompanying note Judge Heller expressed the view that the indication on the return receipt of service on an agent was "not satisfactory to comply with Md.Rule 2–124(c)." The cited rule provides in relevant part:

"Rule 2–124.  **Process—Persons to be Served.**

. . . .

"(c) **Corporation.**—Service is made upon a corporation ... by serving its resident agent, president, secretary, or treasurer. If the corporation ... has no resident agent or if a good faith attempt to serve the resident agent, president, secretary, or treasurer has failed, service may be made by serving the manager, any director, vice president, assistant secretary, assistant treasurer, or other person expressly or impliedly authorized to receive service of process."

The docket in this action, immediately following entry of the order of default, reflects: "(Copies mailed to ... Mr. Young for Desco Insulation Company and Mr. Anthony Dintino for Diversified Environmental Group, Inc. on 5/23/88)." [3]

———

**3.** Maryland Rule 2–613, "Default Judgment," provides in subsection (b), in relevant part, as follows:

"**Notice.**—Promptly upon entry of an order of default, the clerk shall issue a notice informing the defendant that the order of default has been entered and that the defendant may move to vacate the order within 30 days after its entry. The notice shall be mailed to the

In August 1988 the matter again came before Judge Heller for the entry of judgment on the order of default. No representative of the Trade Name or Debtor was present. Counsel for IRM told the court that she had communicated, by telephone, the date for the hearing to a named attorney at a named Philadelphia law firm which was counsel for the Trade Name and Debtor. IRM's counsel further represented to the court that that Pennsylvania lawyer had indicated that he probably would not appear at the hearing and that "his clients had served him with notice of the proceeding and the papers—the complaint copies."

The president of IRM testified that, in March 1987, IRM had stopped doing work for Trade Name due to non-payment and that, as the situation worsened, IRM had spoken with Debtor. The court noted that, in early April 1987, Debtor had written to IRM seeking a written confirmation of Debtor's liability to IRM. The court thereupon entered judgment in favor of IRM against both Debtor and the Trade Name. The judgment was for the principal balance of $78,204, prejudgment interest of $10,763.05, and court costs.

## Facts—Issue II

In March 1989 IRM caused writs of garnishment to be issued on its judgment and directed service on Diversified Environmental Corporation (DEC) and LVI Environmental Services, Inc. at the Rockville address. They are the same corporation. DEC was incorporated under Pennsylvania law on June 25, 1987, and, on February 1, 1988, it changed its name to LVI Environmental Services, Inc. We shall refer to this Pennsylvania corporation, the respondent in this Court, as DEC or Garnishee. Garnishee, in the latter half of 1987, had acquired the former assets of Debtor. How that came about requires the review of a number of transactions.

---

defendant at the address stated in the request and to the defendant's attorney of record, if any."

Debtor had financed its operations by borrowing from three different lenders, Crouse Group, Inc. (Crouse), Meridian Bank (Meridian), and Bell Savings & Loan Association (Bell). Debtor had effected a revolving loan agreement with Bell in July 1984 for a line of credit secured by assignments of Debtor's rights in customer contracts acceptable to Bell and by personal guarantees. The maximum outstanding balance at any one time under the line of credit was the lesser of $1 million or ninety percent of the balance to be paid on assigned customer contracts. Debtor had a similar arrangement with Meridian. That agreement originated in August 1985 and involved a line of credit up to the lesser of $500,000 (later $600,000) or eighty percent of balances on assigned customer contracts. Meridian's security agreement also included Debtor's office furniture and equipment.

Debtor's borrowings from Crouse began as early as May 1985 and were secured by contract rights, accounts receivable, and personal guarantees.

By June 10, 1987, the original principal amount of notes issued by Debtor to Crouse totalled $3,680,209.41. This included $1,019,091.04 (including prepaid interest) that Debtor had borrowed from Crouse on November 19, 1986, secured by anticipated proceeds of $1,094,612.10 under a contract with the Department of the Army involving asbestos rehabilitation work at Fort Belvoir.

In or about April 1987 Debtor lost Crouse as a source of financing when Crouse became involved in reorganization proceedings under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Eastern District of Pennsylvania. That change in Debtor's circumstances, coupled with its failure to remit payments from customers on assigned contracts, caused Meridian to call its loan. Debtor then negotiated an agreement of June 10, 1987, with representatives of Crouse. Under that agreement Debtor's obligation to Crouse, and the personal guarantees of Debtor's principals, would be satisfied by the payment of $1,995,084, and Crouse's security interest in the assets of Debtor would be terminated.

The agreement also included payment by a Debtor-related company of an additional $983,200.98 in satisfaction of that other company's indebtedness to Crouse. Conditions precedent to the agreement included the production by Debtor and the related company of a commitment to fund $2,300,000.

Debtor had been unable to secure the financing when its representatives approached representatives of NICO, Inc. (NICO) about the possible acquisition by the latter of Debtor. NICO was a wholly owned subsidiary of LVI Group, Inc., a publicly traded, nationally listed corporation. NICO, in turn, owned all of the stock of LVI Environmental Services Group, Inc. The latter engaged in asbestos abatement contracting in a number of areas in the United States through wholly owned, direct subsidiaries, respectively incorporated in different states. Almost all of these subsidiaries were named LVI Environmental Services, Inc.

NICO was interested in entering the asbestos removal contracting field in the area in which Debtor was doing business, but NICO was not in the least interested in assuming Debtor's liabilities. Nevertheless, an agreement was reached, dated August 6, 1987, under which NICO would purchase Crouse's position as Debtor's secured creditor for the same amount, $1,995,084, for which Crouse was willing to release Debtor. NICO also effected agreements for the purchase from Meridian and from Bell of their secured positions *vis-a-vis* Debtor. NICO's objective was to obtain Debtor's assets, particularly Debtor's contracts for work not yet in progress. Inasmuch as Debtor would not be able to pay its obligations to Crouse, Meridian, and Bell, NICO, standing in the shoes of those secured creditors, would obtain the assets of Debtor through a friendly foreclosure. NICO could then expand the geographical area and volume of its business through its newly created sub-subsidiary, DEC.[4]

---

**4.** Although there was no fact-finding on this point by the circuit court, there is the strong suggestion in the record that the benefit to Debtor's principals in this arrangement was that the personal liabilities of the guarantors, at least with respect to the Crouse loan, were extinguished.

The August 6 agreement with Crouse *et al.* was approved by the bankruptcy court on August 13, 1987. Also, on August 6, 1987, an agreement was reached whereby, for $500,000 paid by NICO to Bell, Bell would sell to NICO Debtor's $961,840.21 obligation and its security. NICO effected a similar arrangement with Meridian by an agreement of September 14, 1987. NICO agreed to pay $345,000 to acquire all of Meridian's interests in loan documents evidencing Debtor's principal obligation to Meridian of $359,746.42, plus interest of $9,212.94 as of September 1, 1987, together with Debtor's principals' personal obligations to Meridian as of that date of $80,411.94, plus $2,047.15 interest.

Thus, NICO paid approximately $2,840,000 to acquire Debtor's obligations to the three lenders and their security interests in Debtor's assets. Then, by an agreement dated November 18, 1987, Debtor and its related companies, acknowledging their default, agreed to convey the security to NICO's assignee in lieu of foreclosure, and the parties agreed on a method for crediting amounts to be realized on the security against Debtor's obligation. In that agreement Debtor also acknowledged the accuracy of the description of the collateral to be conveyed as "all of the contract rights, assets, accounts receivable and other tangible and *intangible* property of DEBTOR." (Emphasis added). On December 1, 1987, Debtor confirmed the transfer of Debtor's interest in its former contracts to DEC, the Garnishee in these proceedings, as assignee of the rights of NICO under the November 18 agreement.

By at least September 1987, if not earlier, DEC began doing asbestos removal business for former customers of Debtor and used Debtor's Trade Name, former employees, and equipment. In Rockville, DEC operated out of the Debtor's former leased premises under an assignment of the lease. DEC installed a new manager there. An estimator, who had left

---

In addition, two individuals who had been officers of Debtor respectively became president and executive vice president of DEC when it was incorporated in June 1987.

Debtor's employ at the Rockville office in June 1987 because the business was not successful, returned in September 1987 as an employee of DEC. The estimator testified that, over a period of time, the Trade Name was used less and less while the new name, LVI, was being introduced to the customers.

### Procedural History

IRM issued the writ of garnishment in March 1989. Garnishee answered and denied holding any property of the judgment debtor. After IRM had changed counsel to its present attorneys, the garnishment came on for hearing in September 1994 before Judge Eugene M. Lerner. The circuit court concluded that Garnishee was directly liable to IRM as the successor of Debtor. Judgment was entered against Garnishee for $89,092.05, with interest from August 16, 1988.

Garnishee appealed to the Court of Special Appeals, which reversed the judgment. *LVI Envtl. Servs., Inc. v. Academy of IRM,* 106 Md.App. 699, 666 A.2d 899 (1995). The Court of Special Appeals held that Garnishee, by answering the writ of garnishment without raising any jurisdictional issues, had waived Garnishee's contention that personal service had never been effected on the Debtor. That court also held, *inter alia,* that "IRM could not transform the garnishment proceeding into a direct cause of action against [Garnishee] and proceed on a theory of successor corporation liability." *Id.* at 709, 666 A.2d at 904.

### I

Garnishee asserts that the circuit court never obtained *in personam* jurisdiction over Debtor so that the judgment against Debtor is subject to collateral attack. On this issue Garnishee relies solely on the initial ruling by the circuit court when it declined to enter an order for default against Debtor.

Garnishee further submits that a trade name is not a legal entity. Without citation of any authority, Garnishee asserts that a judgment entered against a trade name is a nullity.[5] In opposition to Garnishee's contentions, IRM advances a number of arguments, including the lack of any jurisdictional defect in the service of process on Debtor.[6]

## A

Critical to determining the efficacy, at least facially, of the service of process on Debtor is the interpretation of the certified mail return receipt filed by IRM. The certified mail was directed to "Anthony J. Dintino, Controller" of Debtor. We interpret "controller" to be the equivalent of "treasurer" as the latter term is used in Md.Rule 2–124(c).[7] Thus, IRM undertook to effect service on the foreign corporation by targeting the registered mail to one of the corporate representatives who was within the first priority grouping under Md.Rule 2–124(c). Consequently, signing of the receipt, "Karen L. Reserdiz" as "agent," indicated an agency to receive certified mail restricted for delivery to "Anthony J. Dintino, Controller" and not an agency to accept the service of process

---

**5.** Maryland Code (1957, 1996 Repl.Vol.), Art. 2, § 20 provides for the entry of judgment against trade names under the circumstances therein provided.

**6.** IRM contends that Garnishee failed conditionally to cross petition from the denial by the Court of Special Appeals of Garnishee's collateral attack on the judgment against Debtor. We note, however, that Garnishee stated in its answer to IRM's petition for certiorari that the alleged lack of personal jurisdiction would be raised if the petition for certiorari were granted.

We choose to decide the jurisdictional issue because it is of broader public importance than whether there was a waiver in this particular case. In so doing, we intimate no opinion on the correctness of the waiver holding by the Court of Special Appeals.

**7.** The Pennsylvania corporation law, 15 Pa.C.S. § 1732(A) (1996), requires a corporation to have "a president, a secretary and a treasurer, or persons who shall act as such, regardless of the name or title by which they may be designated, elected or appointed...." Garnishee has not shown that Debtor had both a treasurer and a controller.

on behalf of Debtor.[8]

We hold that the return of service on Debtor, with its accompanying return receipt, *prima facie* evidences service of process on Debtor in the underlying action, by service on Debtor's "treasurer." The provision in Md.Rule 2–121(a) for service by certified mail with "Restricted Delivery" necessarily contemplates deliveries that are consistent with the requirements and practices of the United States Postal Service for that type of mail. The Domestic Return Receipt, Postal Service Form 3811 of February 1986 that was filed in this case, directs the letter carrier "[a]lways [to] obtain signature of addressee or agent. . . ."

The instruction on the return receipt form is further explained by United States Postal Service, Domestic Mail Manual, Issue 49, S916.3.1, at S–33 (Sept. 1, 1995), dealing with restricted delivery. That subsection provides:

"Mail marked 'Restricted Delivery' is delivered only to the addressee or to the person authorized in writing as the addressee's agent to receive the mail, subject to D042 and to these exceptions:

"a. Mail for famous personalities and executives of large organizations is normally delivered to an agent authorized to sign for such mail."

Thus, an exception to the requirement of an authorization in writing exists with respect to restricted deliveries to executives of large organizations. This is entirely consistent with general business practices. The corporate officers on whom Rule 2–124(c) directs service on a corporation first to be

---

**8.** IRM relies on *Steed Mortgage Co. v. Arthur*, 37 Md.App. 592, 378 A.2d 690 (1977), but that decision presents a different issue. In that case the return stated that service on a corporate garnishee had been made by personally serving a vice president of the corporation. Vice presidents are not within the first priority class of corporate representatives for service of process under Md.Rule 2–124(c). After concluding that there was no due process violation because the corporation had actual notice of the proceedings, the Court of Special Appeals stated that "[i]n any event, the service upon one in a secondary category without an attempt to serve a priority class is procedural rather than jurisdictional." *Id.* at 604, 378 A.2d at 698. We intimate no opinion on this analysis.

attempted are the class of officers least likely to interrupt their business activities to sign for registered mail. Further, these corporate officials are most likely to have authorized, expressly or impliedly, some responsible person at the corporate place of business to sign for registered mail that is directed to that specific officer. Similarly, this Court, in the exercise of its rulemaking power, did not intend to construct so unrealistic a method of service of process as to require Postal Service letter carriers, or even personal delivery process servers, to pursue corporate executives into their inner *sancta* in order to obtain personal signatures on restricted delivery mail receipts. In a particular case, it may become a question of fact whether the person who signed the return receipt was an agent for accepting the delivery of certified mail on behalf of the corporate officer to whom delivery was restricted.

■ In the instant matter, there is no direct evidence bearing on who Karen L. Reserdiz is, or what her actual authority might have been to sign for restricted mail addressed to Anthony J. Dintino. Nevertheless, the inference from the fact that she was at Dintino's office is that she was so authorized. Here, the burden was on Garnishee to demonstrate that service had never been effected on Debtor by certified mail.

■ Simply because delivery was made to a person other than the officer identified on the receipt or in the summons does not mean that service was invalid and personal jurisdiction was lacking. A line of New York cases, led by *Fashion Page, Ltd. v. Zurich Ins. Co.*, 50 N.Y.2d 265, 428 N.Y.S.2d 890, 406 N.E.2d 747 (1980), gives appropriate weight to the internal practices of particular business organizations. In *Fashion Page* a process server had been instructed to serve the defendant insurance company. A receptionist at the defendant's offices directed the process server down a corridor to where a woman was seated at a desk. That woman accepted the papers after having been told that they were a summons and complaint. "When [the process server] asked her if she

was authorized 'to accept this', she stated 'I can take it.' " 428 N.Y.S.2d at 892, 406 N.E.2d at 749. In upholding the validity of the service of process, the court stated:

"Thus a corporation may assign the task of accepting process and may establish procedures for insuring that the papers are directed to those ultimately responsible for defending its interests. A process server may, of course, always serve the corporate personnel specifically identified in the statute. The corporation however cannot escape the consequences of establishing alternative procedures which it may prefer. In such a case the process server cannot be expected to know the corporation's internal practices. Reliance may be based on the corporate employees to identify the proper person to accept service. In such circumstances, if service is made in a manner which, objectively viewed, is calculated to give the corporation fair notice, the service should be sustained.

"In evaluating whether service is to be sustained, the circumstances of the particular case must be weighed. Delivering the summons to a building receptionist, not employed by the defendant, without any inquiry as to whether she is a company employee, would not be sufficient. Such service cannot be upheld even though the receptionist may later deliver the summons to the proper party. 'To sustain such service would encourage carelessness, or worse, thus increasing the risk of default by parties who in fact fail to receive the summons.' Nor is it always reasonable, under all circumstances, for the process server to rely on claims of authority made by the defendant's employees. For instance, a remark made by an employee, temporarily visiting the State, that he represents the corporation has been held insufficient to establish his authority to accept process on its behalf. But when the corporation is regularly doing business in the State, it generally cannot be heard to complain that the summons was delivered to the wrong person when the process server has gone to its offices, made proper

inquiry of the defendant's own employees, and delivered the summons according to their directions."

*Id.*, at 894, 406 N.E.2d at 751 (citations omitted).

The New York cases applying *Fashion Page* are reviewed in *Melkaz Int'l Inc. v. Flavor Innovation Inc.*, 167 F.R.D. 634 (E.D.N.Y.1996). *See also Nationwide Mut. Ins. Co. v. Kaufman*, 896 F.Supp. 104 (E.D.N.Y.1995); *Seward & Kissel v. Smith Wilson Co.*, 814 F.Supp. 370 (S.D.N.Y.1993); *Carlin v. Crum & Forster Ins. Co.*, 170 A.D.2d 251, 565 N.Y.S.2d 519 (1991); *Von Thaden v. S.J. Groves & Sons Co.*, 97 A.D.2d 677, 469 N.Y.S.2d 172 (1983); *Conroy v. International Terminal Operating Co.*, 87 A.D.2d 858, 449 N.Y.S.2d 294 (1982); *De Vore v. Osborne*, 78 A.D.2d 915, 432 N.Y.S.2d 919 (1980); *Kuhlik v. Atlantic Corp.*, 112 F.R.D. 146 (S.D.N.Y.1986); *Leo v. General Elec. Co.*, 111 F.R.D. 407 (E.D.N.Y.1986). *But see Hemmerich Indus., Inc. v. Moss Brown & Co.*, 114 F.R.D. 31 (E.D.Pa.1987) (applying Pennsylvania law).

From the standpoint of the efficacy of personal service, we see no substantial difference between the above-cited cases, where a process server is attempting to identify a person who is authorized to receive service of process within an organization, and cases in which a letter carrier is attempting to find either the restricted addressee or someone who is authorized to sign for that restricted addressee.

*Poole v. Hanover Brook, Inc.*, 34 N.C.App. 550, 239 S.E.2d 479 (1977), *cert. denied*, 294 N.C. 183, 241 S.E.2d 518 (1978), is on point. In that case, certified mail for service on the defendant corporation in Chicago, Illinois was restricted to the corporation's president, but the return receipt was signed by another person as "Authorized Agent." 239 S.E.2d at 480. The court held it to be a reasonable inference that the person signing received the summons and complaint on behalf of the corporate president and "was a person of reasonable age and discretion authorized to receive registered mail and sign the receipt for the addressee." *Id.* at 482. This created "a rebuttable presumption of valid service," which the defendant in that case did not attempt to rebut. *Id. See also Beck v.*

*Atlantic Contracting Co.,* 157 F.R.D. 61, 64 (D.Kan.1994) ("The court believes that even where the process is not delivered to the agent in hand, if it is accepted as special, certified mail by an employee at the agent's place of business, it is highly likely that the agent will get the notice and will take the appropriate steps to initiate the corporation's response."); *Evans v. Advance Schools, Inc.,* 70 Ill.App.3d 947, 27 Ill.Dec. 40, 388 N.E.2d 1003 (1979) (want of jurisdiction does not affirmatively appear on the face of the record from the presence of a return receipt signed by person other than the person to be served).

In the instant matter Garnishee did not produce any evidence that contradicts the *prima facie* validity of the service of process on Debtor. Consequently, Garnishee's contention that *in personam* jurisdiction was never acquired over Debtor fails.

### B

Once *in personam* jurisdiction had been acquired over Debtor, it was no longer necessary for further notices in the proceeding to be served on Debtor in the manner required for the service of original process. Consequently, when notice of the order for default was mailed by the circuit court clerk to the Pennsylvania address at which service had been effected, that notice complied with Md.Rule 2–613(b). Further, notice that an order for default had been entered against Trade Name was notice to Debtor that an order for default had been entered against it, since Trade Name was simply another name by which Debtor was known, at least in the Washington, D.C. metropolitan area.

In any event, entry of the order for default against the Trade Name, and use of the Trade Name in the notice of that order, are at most misnomers which had no effect on the personal jurisdiction of the Circuit Court for Anne Arundel County over Debtor in the underlying action.

## II

IRM's judgment against Debtor represented work done by IRM for Debtor prior to April 1987, approximately three months or more before Garnishee was incorporated. The circuit court did not find that the writ of garnishment reached property or credits of Debtor in the hands of Garnishee. The circuit court imposed liability on Garnishee for Debtor's pre-existing obligation to IRM based on the following rationale:

> "I find that there really was a continuation of the business. It's the same business. It's operated in the same place. [DEC] has the same employees. [DEC] has the same trucks, the same [asbestos removal contractor] numbers."

The "general or traditional rule" is that a " 'corporation which acquires all or part of the assets of another corporation does not acquire the liabilities and debts of the predecessor, unless: ... (3) the successor entity is a mere continuation or reincarnation of the predecessor entity....' " *Nissen Corp. v. Miller*, 323 Md. 613, 617, 594 A.2d 564, 565–66 (1991) (quoting 1 *American Law of Products Liability 3d* § 7:1, at 10–12 (Travers, rev. ed. 1990)). It is that third exception to the general rule that the circuit court undertook, we think erroneously, to apply to the facts of the instant matter.[9]

Successor liability predicated on continuity of the entity is to be distinguished from continuity of the enterprise. This Court in *Nissen Corp.* refused to adopt continuity of the enterprise as a basis for successor liability. "The mere continuation or continuity of entity exception applies where 'there is a continuation of directors and management, shareholder in-

---

9. Garnishee contends that successor liability may not be asserted in a garnishment proceeding and that a new action would have to be filed which, in the instant matter, would be barred by limitations. Garnishee further asserts that, even if successor liability is cognizable in a garnishment proceeding, IRM never amended to assert a claim on that theory. The Court of Special Appeals agreed that the action could not be so transformed. *LVI Envtl. Servs., Inc. v. Academy of IRM*, 106 Md.App. 699, 709, 666 A.2d 899, 904 (1995). We shall assume, *arguendo*, that successor liability has been properly raised, and we shall address the merits.

terest and, in some cases, inadequate consideration.  The gravamen of the traditional "mere continuation" exception is the continuation of the *corporate entity* rather than continuation of the business operation.' "  *Id.* at 620, 594 A.2d at 567 (quoting 1 L. Frumer & M. Friedman, *Products Liability* § 2.06[2][c], at 2–182 to 2–183 (1989)).  " '[A] continuity of enterprise analysis seeks to establish whether there is substantial continuity of pretransaction and posttransaction *business activities* resulting from the use of the acquired assets. . . .' "  *Id.* at n. 1 (quoting 1 *American Law of Products Liability 3d* § 7:20, at 37 (Travers, rev. ed. 1990)).  In the instant case, the circuit court's focus on the Garnishee's performance of asbestos removal, operating out of the Debtor's old site and using the Debtor's former employees and equipment, emphasized the continuation of the enterprise, without examining whether there was a continuation of the entity.

■  Three factual aspects of Garnishee's activities merit special attention:  its use of the Trade Name, its Maryland license for asbestos removal/encapsulation, and its work on the Fort Belvoir contract.  DEC used the Trade Name in some aspects of its business for an undefined period, which the circuit court recognized to be the period of transition and which may have run from September 1987 until sometime in 1988.  DEC takes the position that the Trade Name is one of the intangible assets of Debtor that DEC acquired by foreclosing the security interests.  In *Nissen Corp.* the sale of assets included the seller's trade name, and the buyer also obtained covenants prohibiting the seller and its shareholders from using the trade name, although the seller, under a name change, would continue in business for five years.  *Id.* at 615–16, 594 A.2d at 565.  It was argued that "because Nissen [the buyer] enjoyed [the predecessor's] goodwill and held itself out as the effective continuation of [the predecessor]," Nissen was liable to the plaintiff.  *Id.* at 621, 594 A.2d at 568.  That use of the seller's goodwill was not sufficient to give rise to continuation of the entity liability or to persuade this Court to recognize continuation of the enterprise as a basis of liability.  *Id.* at 625–26, 632–33, 594 A.2d at 570, 573–74.

In the case *sub judice,* the circuit court also relied on the "same numbers" on state licenses for asbestos removal. In the spring of 1987 Debtor's license, issued to Trade Name, was to expire June 9, 1987, and application for renewal was to be made by the end of May. The license was renewed June 10, 1987, to expire June 9, 1988, with two certificates issued, one to Debtor at the Rockville address and one to Trade Name at its Pennsylvania address. The next year a license was issued June 10, 1988, to expire June 9, 1989, with the same license number as on those previously issued to Debtor, but the holder of the new license was identified as LVI Environmental Services, Inc., *i.e.,* DEC after its name change.

IRM also called as a witness a civilian contract-specialist with the Army Corps of Engineers (the Corps) who had reviewed files concerning the contract or contracts for asbestos removal at Fort Belvoir. The witness had been asked to compile information relating to checks issued to Garnishee, apparently in connection with an IRM contention, not found by the trial court, that checks issued to Garnishee were the property of Debtor. The witness testified that there was no novation in the files by which DEC was substituted for Debtor, although on May 12, 1989, in response to an inquiry, the Corps had advised someone that a novation would be required "to change names."

Whether Garnishee violated Maryland license requirements or the federal anti-assignment statute, 41 U.S.C. § 15 (1994), are not issues before us. In the face of the well documented and uncontradicted record, reviewed above, tracing the step-by-step acquisition by Garnishee of Debtor's assets, the inferences adverse to Garnishee from the somewhat sketchy evidence involving the work at Fort Belvoir and the Maryland licenses is legally insufficient to support imposition of the continuation of entity theory.

That theory " 'is designed to prevent a situation whereby the specific purpose of acquiring assets is to place those assets out of reach of the predecessor's creditors. In other words, the purchasing corporation maintains the same

or similar management and ownership but wears a "new hat." ' " *Nissen Corp.*, 323 Md. at 618, 594 A.2d at 566 (quoting *Baltimore Luggage Co. v. Holtzman*, 80 Md.App. 282, 297, 562 A.2d 1286, 1293 (1989), *cert. denied*, 318 Md. 323, 568 A.2d 28 (1990)). Here, no former shareholder in Debtor holds any ownership of DEC, LVI Environmental Services Group, Inc., or NICO. No shareholder of Debtor is a director of DEC or its parent companies. The only transfusion from old to new was at the level of employees. Two officers of Debtor became officers of DEC.

Moreover, the security interests taken by the three lenders were clearly *bona fide*, and the amounts paid by NICO to acquire those security interests were substantial. The largest of the transactions, NICO's purchase from Crouse, was approved for fairness by the bankruptcy court. In any event, IRM does not contend that the consideration was not fair, and the circuit court made no such finding. Further, there is no question but that Debtor was in default on the loans, and there is no finding by the circuit court that any aspect of the acquisition by DEC of the former assets of Debtor was fraudulent as to unsecured creditors. Under the facts of this case successor entity liability does not lie.

The instant matter is not unlike that in *State ex rel. Donahue v. Perkins & Will Architects, Inc.*, 90 Ill.App.3d 349, 45 Ill.Dec. 696, 413 N.E.2d 29 (1980). There, the plaintiff, an unsecured creditor, had sold glass to the transferor, a manufacturer of insulated windows. Six lenders, who had joined in a substantial loan to the transferor, held a security interest in all of the transferor's assets. They also held all of the transferor's stock in a voting trust that was created as additional security by the transferor's sole shareholder. 45 Ill. Dec. at 697, 413 N.E.2d at 30. The lenders ousted the sole stockholder as president and hired a new manager, but the business continued to decline. As a result, the lenders liquidated the transferor by an assignment for the benefit of creditors. The lenders then formed the buyer corporation which purchased the transferor's assets for $7,500, subject to the existing security interest. *Id.* at 698, 413 N.E.2d at 31.

The Illinois appellate court rejected the unsecured creditor's contention that continuation of the entity liability should have been imposed by the trial court. The court held that there was no continuity of shareholders in that "nothing in plaintiff's arguments persuades us that a security interest, or a security interest in combination with voting control, should create an interest equivalent to ownership of corporate stock." *Id.* at 699, 413 N.E.2d at 32. The court applied the rule that "[a]n involuntary reorganization, that is, one forced on the corporation by its creditors, usually taking the form of bankruptcy or foreclosure, ordinarily leaves unsecured creditors without recourse against the successor corporation." *Id.* The assignment for the benefit of creditors was the functional equivalent of foreclosure. The court further said:

> "[G]iven the impending demise of [transferor], the lending group could have foreclosed on its security interest, in which event the unsecured creditors would have been left with little or nothing. Instead, the lenders caused a liquidation of [transferor's] assets through an assignment for benefit of creditors. This action enabled the lenders to preserve the value of [transferor's] assets by purchasing them in the name of a viable corporation. This method of involuntary reorganization was no more prejudicial to [transferor's] unsecured creditors than other available means. Under the circumstances, we find no reason to depart from the usual rule that involuntary reorganization extinguishes old debts."

*Id.* at 699–700, 413 N.E.2d at 32–33. *Compare Bennett Heating & Air Conditioning, Inc. v. NationsBank of Maryland,* 342 Md. 169, 674 A.2d 534 (1996) (mortgage foreclosure sale not invalidated by pre-sale agreement between lender and ultimate foreclosure purchaser to use foreclosure for the purpose of wiping out junior liens).

A case that emphasizes adequacy of consideration is *Uni–Com Northwest, Ltd. v. Argus Publishing Co.,* 47 Wash.App. 787, 737 P.2d 304, *rev. denied,* 108 Wash.2d 1032 (1987). There, the plaintiff was an unsecured creditor of a publishing corporation, Argus, that was wholly owned by one Murray. Printing for Argus was done by Murray Publishing Company

(MPC), that was sixty percent owned by the same Murray. As Argus fell behind in its payments to MPC, MPC took a security interest in the assets of Argus. When the indebtedness of Argus to MPC exceeded $1,200,000, MPC decided to foreclose, and Argus "acquiesced." 737 P.2d at 307. MPC took over the Argus business, paid its current operating expenses, collected its remaining accounts receivable, credited them against the obligation of MPC, and took a bad debt deduction for the balance owed by Argus. The continuation of what had been the business of Argus represented about fifty percent of the total business of MPC. *Id.* at 311.

The Washington court held that the continuation of entity exception to the non-liability of successors did not apply in the case because "[a] key element . . . is insufficient consideration running to the seller from the purchaser corporation." *Id.* at 313. The plaintiff in that case cited *Brockmann v. O'Neill,* 565 S.W.2d 796 (Mo.Ct.App.1978), and *National Carloading Corp. v. Astro Van Lines, Inc.,* 593 F.2d 559 (4th Cir.1979), both of which are relied upon by IRM in this Court. We agree with the distinction of these cases enunciated in *Uni–Com,* namely that "none of them involve a creditor taking over an insolvent debtor to collect a bona fide debt pursuant to a valid, perfected security interest. Nor do they involve a creditor . . . who has substantial business interests in addition to those of the business assumed." *Uni–Com,* 737 P.2d at 313.

IRM also relies upon *H.J. Baker & Bros., Inc. v. Orgonics, Inc.,* 554 A.2d 196 (R.I.1989). In that case, a corporation manufactured chemicals on leased premises. The corporation was in serious financial difficulties and had halted operations. Its largest shareholder, O'Donnell, bought up all the mortgage interests on the property that the corporation leased from the landlord, Fezido. O'Donnell then declared the mortgages in default, advertised the foreclosure, obtained a default judgment, and caused a sheriff's execution sale of the Fezido stock. *Id.* at 200. O'Donnell purchased the stock for $50 and "thus became the owner of Fezido Corporation, the real estate holding company, and therefore the owner of the [old corporation's] property." *Id.*

The Supreme Court of Rhode Island found persuasive a test listing five criteria for imposing continuing entity liability that had been set forth in *Jackson v. Diamond T. Trucking Co.,* 100 N.J.Super. 186, 196, 241 A.2d 471, 477 (1968). Applying those criteria to the facts before it, the Rhode Island court concluded that the unsecured creditor plaintiff was entitled to a new trial.

The criteria listed by the Rhode Island court are:

"(1) there is a transfer of corporate assets; (2) there is less than adequate consideration; (3) the new company continues the business of the transferor; (4) both companies have at least one common officer or director who is instrumental in the transfer; and (5) the transfer renders the transferor incapable of paying its creditors because it is dissolved either in fact or by law."

*H.J. Baker,* 554 A.2d at 205.

We need not decide in this case whether we endorse the foregoing test. It is sufficient for present purposes to note that here there was adequate consideration paid by NICO. Further, IRM did not introduce any proof to show that either or both of the individuals who had been officers of Debtor and who became officers of DEC were "instrumental" in the transfer.

The decision of the trial court was based either on a rule of law that is not part of Maryland law or on facts that are insufficient to support continuing entity liability. In either event the result is the same. The reversal of the circuit court judgment by the Court of Special Appeals should be affirmed.

*JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED. COSTS TO BE PAID BY THE PETITION-ER, ACADEMY OF IRM.*