## STATE OF MARYLAND *v.* MARGARET REESE

[No. 134, September Term, 1977.]

*Decided July 13, 1978.*

The cause was argued before MURPHY, C. J., and DIGGES, LEVINE, ELDRIDGE, ORTH and COLE, JJ.

*Bruce C. Spizler, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General, Clarence W. Sharp, Assistant Attorney General,* and *Maria A. Kendro, Assistant Attorney General,* on the brief, for appellant.

*Walter M. Baker,* with whom were *Baker & Lockhart, P.A.* on the brief, for appellee.

LEVINE, J., delivered the opinion of the Court.

In the present appeal we are called upon to determine whether the making of a false or fictitious entry in the tax rolls of a county government constitutes the crime of forgery either at common law or under Maryland Code (1957, 1976 Repl. Vol.) Art. 27, § 44. Early in 1976, appellee, then Deputy Treasurer of Kent County, Maryland, was indicted on multiple charges arising out of her alleged misappropriation of public funds and falsification of certain county tax records.[1] At the conclusion of a three-day trial in the Circuit Court for Caroline County, the jury found appellee guilty on eight counts of forgery.[2] Thereafter, appellee noted an appeal to the Court of Special Appeals, which reversed the convictions on the ground that the acts complained of did not amount to forgery under Maryland law. *Reese v. State,* 37 Md. App. 450, 458, 378 A. 2d 4 (1977). Because the issue raised here is one of first impression in this state, we granted certiorari, and for the reasons set out below we now affirm.

The grand jury indictment accused appellee of falsely making, altering, forging and counterfeiting "certain entries declaring acquittance or receipt for money." In particular, it was alleged that appellee had noted upon the Kent County tax rolls, for fiscal year July 1, 1973 to June 30, 1974, false interest charges on the state and county tax accounts of several Kent County property taxpayers. The indictment

---

1. Specifically, the grand jury charged appellee with 13 counts of ordinary embezzlement, 13 counts of embezzlement by a public official, 13 counts of larceny after trust, 13 counts of accessoryship after the fact, 13 counts of forgery, and one count of violation of oath of office, making a total of 66 counts.

2. These proceedings were commenced originally in the Circuit Court for Kent County, but were transferred to Caroline County at appellee's request.

further averred that appellee had fabricated certain entries indicating the date on which individual property owners had remitted their tax payments.

According to the testimony of the State's principal witness, accountant and auditor William G. Noppinger, property taxes in Kent County are ordinarily billed, paid, and processed in the following manner. Taxpayers receive in the mail a tax bill which has been preprinted on an addressograph machine in the Treasurer's office. A taxpayer wishing to pay his bill may do so either by cash or check. When payment is received at the Treasurer's office, copies of the bill previously sent to the taxpayer are pulled from a special file drawer containing only unpaid tax bills. One of these copies is then marked paid, initialed by the attending official and handed or mailed to the taxpayer. The funds received are placed in a cash drawer where they remain until counted at the end of the day. A clerk then takes one of the remaining duplicates of the tax bill and places it on a spindle. After completing a day's business, the sum total of the money and checks in the cash drawer is compared with the aggregate amount of the paid tax bills placed on the office spindle; in theory these figures should agree. Monies collected are then deposited with a local bank on a daily basis. There was evidence to show that appellee was primarily responsible for making the bank deposits.

In the meantime, another employee takes the paid bills, arranges them by tax district and "posts" them to the tax rolls. The tax rolls are essentially ledgers, consisting of alphabetical computer listings of taxpayers by district. Opposite each taxpayer's name are several vertical columns indicating the description of the property, the values of land and improvements (separately listed), the amount of state and county taxes due, the total tax and the date of payment. Posting a bill to the rolls simply involves entering the date of payment in the appropriate column together with any added interest charges if payment is late. It was customary in the Kent County Treasurer's office to denote the payment date with a rubber stamp entry whenever a bill was paid on time. Late payments on the other hand were designated by

a long-hand notation. It was not uncommon for appellee to take part in the posting procedure.

After posting the paid bills, a clerk would then place all such bills into a special binder. In no event would posted bills be returned to the file drawer, which was reserved exclusively for unpaid items. Thus, under this system, all outstanding accounts could be identified by searching the special file drawer for a particular bill or by running the tax rolls.

During the course of a routine audit of the books and records of the Kent County Treasurer's office in mid-1975, Mr. Noppinger, quite by accident, uncovered an intricate scheme whereby the Treasurer, Elizabeth Crowding, with the apparent assistance of appellee, managed to embezzle upwards of $10,000 in tax monies.[3] Just how this scheme was effectuated is best illustrated by the following description of a hypothetical transaction spanning a one-year period.

Sometime in 1973, taxpayers A and B would come to the Treasurer's office to pay their property taxes for fiscal year 1973-1974. Taxpayer A would pay in cash and B by check. A clerk would issue legitimate paid receipts to both. At the time the daily bank deposits were made, however, someone would siphon off A's cash payment and use B's check to cover the embezzlement. The office copy of A's tax bill would then be posted to the tax rolls and filed in the paid-bill binder. B's bill, however, would usually disappear and, as far as the tax rolls were concerned, B's account would appear to be overdue, even though payment had, in fact, been effected. B, of course, would not be aware of any irregularity, since he would have received a properly executed receipt for his check payment.

The next year, taxpayer C would arrive and pay his taxes for fiscal year 1974-75; he too would be given a proper receipt. It was at this juncture that it became necessary to tamper with the tax rolls in order to conceal the embezzlement of the previous year. Had B's account continued to appear delinquent on the tax rolls, his property would have been eventually subject to forced sale at public auction. To avoid

---

3. It appears that following a mistrial in Kent County and a retrial in Calvert County, Elizabeth Crowding was convicted of 28 counts of embezzlement and 11 counts of forgery.

this possibility and thereby to prevent B from suspecting any wrongdoing, someone would go to the office typewriter and fabricate a new tax bill for B. Unlike an authentic office copy of a tax bill, the fraudulent "duplicate" would neither have been printed on an addressograph machine nor would it have been placed on the office spindle for paid bills. Using taxpayer C's current payment to cover B's "late payment" for the preceding year's taxes, a clerk would then post B's new and fraudulent tax bill to the tax rolls, noting the date of payment in long-hand just as if B had made a late remittance. The same person would also compute and add accrued interest charges on both state and county taxes; again, the purpose being to create the illusion that B's taxes had been paid a year late and were therefore subject to the statutory interest penalty.

Noppinger testified that at least eight of the long-hand notations in the tax rolls were made in appellee's handwriting. These identifications were subsequently corroborated by Thomas Dulaney, a handwriting analysis expert employed by the Federal Bureau of Investigation in Washington, D. C. It is undisputed that the eight long-hand entries indicating payment date and accrued interest charges were utterly false representations. The sole question before us is whether by making these entries appellee committed the crime of forgery under Maryland law.

## I

Broadly defined, forgery is the fraudulent making of a *false writing* having apparent legal significance. *Nelson v. State,* 224 Md. 374, 378, 167 A. 2d 871 (1961); *Smith v. State,* 7 Md. App. 457, 460, 256 A. 2d 357 (1969); R. Perkins, *Criminal Law* 340 (2d ed. 1969). The offense is comprised of essentially three elements. First, there must be a writing which is the proper subject of forgery. Secondly, this writing must be false. Finally, the writing must have been rendered false with intent to defraud. *Finney v. State,* Ala. App. , 348 So. 2d 876, 877, *cert. denied,* Ala. , 348 So. 2d 878 (1977); *see Smith v. State,* 223 N.W.2d 223, 226 (Iowa 1974). In light of our holding in the present case, it will only be necessary

to discuss the first two prongs, that is, whether a tax roll may be the subject of forgery and, more importantly, whether the falsification of an entry in such an instrument renders the entire document a false writing for purposes of the definition of forgery at common law or under the Maryland forgery statute.

As a threshhold matter, it must first be determined whether a tax roll is a writing with respect to which forgery may be committed. Article 27, § 44, under which appellee was indicted and convicted, sets forth in elaborate detail those documents which, if falsified, will support a conviction for statutory forgery, a felony. Enacted originally in 1799 and modified only slightly in the ensuing 180 years, Article 27, § 44 provides in pertinent part:

> "Any person who shall falsely make, forge or counterfeit, or cause or procure to be falsely made, forged or counterfeited, or willingly aid or assist in falsely making, forging, altering or counterfeiting any deed, document or affidavit of waiver or release of mechanics' lien, will, testament or codicil, bond, writing obligatory, bill of exchange, promissory note for the payment of money or property, endorsement or assignment of any bond, writing obligatory, bill of exchange, promissory note for the payment of money or property, acquittance or receipt for money or property, or any acquisition or receipt either for money or for property, with intention to defraud any person whomsoever, . . . shall be deemed a felon, and on being convicted thereof shall be sentenced to the penitentiary for not less than one nor more than ten years."[4]

Despite the fairly exhaustive list of instruments enumerated in the statute, § 44 makes absolutely no

---

4. The version quoted above is the statute which was in effect at the time the criminal acts forming the subject of this appeal were perpetrated. Article 27, § 44 has since been amended twice. Chapter 62 of the Laws of 1976 added "power of attorney" to the list of writings covered by the statute, while Chapter 392 of the Laws of 1978 deleted the mandatory sentence provision and also imposed a maximum fine of $1,000.

reference to tax rolls or books of account in general. Thus, unless the State is correct in its assertion that the false entries in dispute here are themselves "acquittances or receipts"—an argument we shall later address in a somewhat different context—it is apparent that the statute does not on its face proscribe the conduct ascribed to appellee in the indictment and proved at trial.

The fact that a particular class of documents is not specified in § 44, however, does not preclude prosecution of an accused for forgery of an unenumerated type of instrument, if fraudulent falsification of the writing in question would have been an indictable offense at common law. This Court has held that where a statute has been enacted covering the crime of forgery, common law forgery subsists to the extent that the statute was not intended to preempt the entire field or repeal the common law. *Reddick v. State,* 219 Md. 95, 98, 148 A. 2d 384, *cert. denied,* 360 U. S. 930 (1959); *see Green v. State,* 32 Md. App. 567, 572, 363 A. 2d 530 (1976); Clark & Marshall, *A Treatise on the Law of Crimes* § 12.31, at 953-54 (7th ed. 1967).[5]

Prior to the eighteenth century, it was generally thought that only documents of an important public character (*e.g.,* warrant of attorney, court summons, certificate of ordination) could be the subjects of forgery at common law. 1 W. Hawkins, *Pleas of the Crown* 263 *et seq.* (8th ed. 1824); Turner, *Documents in the Law of Forgery,* 32 Va. L. Rev. 939, 945-46 (1946). Largely as a result of the celebrated case of *R. v. Ward,* 2 Ld. Raym. 1461 (K.B. 1727), however, it became established "that the counterfeiting of *any writing* with a fraudulent intention, whereby another might be prejudiced, is forgery at common law." 2 E. East, *Pleas of the Crown* 861 (1806) (emphasis added); *see also* 4 W. Blackstone,

---

5. Although one cannot be absolutely certain in the absence of any legislative history, it is likely that in enacting the progenitor of present day § 44, the General Assembly of 1799 did not intend to supplant or alter the substantive elements of common law forgery. Rather the principal motivation for the statute was probably to elevate the offense to the status of a felony. *See* 2 J. Bishop, *Criminal Law* § 548 (9th ed. 1923). At common law, the crime of forgery is only a misdemeanor. 2 *Russell on Crime* 1447 (10th ed. 1950).

*Commentaries on the Laws of England* *247 (1765); *and see Arnold v. Cost,* 3 G. & J. 219, 231, 22 Am. Dec. 302 (1831).

A "writing" is one "which, if genuine, might apparently be of legal efficacy or the foundation of a legal liability." *Reddick v. State, supra,* 219 Md. at 98; *State v. Young,* 46 N.H. 266, 267 (1865); 2 *Wharton's Criminal Law and Procedure* § 621 (Anderson ed. 1957); 2 J. Bishop, *Criminal Law* § 523 (9th ed. 1923). Professor Perkins suggests that the writing need only have "apparent legal significance," by which he means that "it must have some value or purpose other than its own existence." R. Perkins, *Criminal Law* 342 (2d ed. 1969).

Applying these criteria to the case at hand, the conclusion is inescapable that a tax roll is a proper subject of common law forgery. That such a document is a writing of at least apparent legal significance is more than amply demonstrated by the fact that it owes its existence to a statutory command. Its "value or purpose" thus lies in the express dictates of state law. Code (1957, 1975 Rep. Vol.) Art. 81, § 46 provides:

> "[T]he supervisor of assessments of each county . . . shall prepare and deliver to the collector a book or books showing the valuation and assessment of all taxable property subject to taxation in each county . . . , and the book or books shall be designated as *the tax roll* for use of the collectors of county and/or city and State taxes." (emphasis added).

Therefore, even though tax rolls are not among the documents listed in Article 27, § 44, they are nevertheless writings for purposes of the offense of forgery at common law.

It is not sufficient, however, that the document in dispute merely meet the definitional requirements for a "writing." To constitute forgery at common law, or for that matter under the forgery statutes as well, the writing must itself be proven false before criminal liability can attach. The difficulty inherent in determining the requisite falsity of an instrument has been called the central problem of the law of forgery, Williams, *Forgery and Falsity,* [1974] Crim. L. Rev. 71, 72, and lies at the heart of the instant appeal.

A document is not considered false for purposes of the law of forgery merely because it contains a false statement of fact. The falsity required by the common law and the statutes refers to the genuineness of the execution of the document itself; that is, there must be a false making. *Gilbert v. United States,* 370 U. S. 650, 658, 82 S. Ct. 1399, 8 L.Ed.2d 750 (1962); *State v. Adcox,* 171 Ark. 510, 286 S. W. 880, 881 (1926); *DeRose v. People,* 64 Colo. 332, 171 P. 359, 360 (1918); *People v. Kramer,* 352 Ill. 304, 185 N. E. 590, 592-93 (1933); *State v. Kinder,* 315 Mo. 1314, 290 S. W. 130, 131-32, 51 A.L.R. 564 (1926); *Goucher v. State,* 113 Neb. 352, 204 N. W. 967, 968, 41 A.L.R. 227 (1925); *Winston v. Warden, Nevada State Prison,* 86 Nev. 33, 464 P. 2d 30, 31 (1970); *Dunn's Case,* 1 Leach 61 (1765); Annot., 41 A.L.R. 229 (1926) (collecting cases). The instrument must purport to be what it is not. *People v. Bendit,* 111 Cal. 274, 43 P. 901, 31 L.R.A. 831 (1896). As one scholar has phrased it, it is not enough that the writing "tells a lie; the writing itself must *be a lie.*" R. Perkins, *Criminal Law* 345 (2d ed. 1969) (emphasis in original); *see* Bentley, *Documents in the Law of Forgery,* 22 Mod. L. Rev. 292 (1959).

Under these principles, it would appear that the making of a false entry in a tax roll or in some other ledger or book of account is tantamount to making a false representation of fact in an otherwise genuine document. This, according to the better-reasoned authority, is not forgery, despite the reprehensible nature of such conduct. As stated by the court below:

> "[T]he making of false entries in the tax rolls may well have been fraudulent but was not a forgery. There was no manufacturing or counterfeiting of a spurious or non-genuine tax roll; there was merely the making of false statements in a genuine document." *Reese v. State, supra,* 37 Md. App. at 458.

The fact that the Kent County tax rolls contained false and fraudulent information did not alter their authenticity, even though the handful of falsifications did undeniably render the

records less accurate. The point is that the official status of the tax rolls remained unchanged after appellee's illicit acts; they were exactly what they purported to be—the tax rolls of Kent County, Maryland.

A similar result was reached by the English Court of Queen's Bench in the landmark case of *Ex Parte Windsor*, 6 Best. & S. 522, 10 Cox. Cr. Cas. 118 (1865). There the United States had sought the extradition from England of a former teller at a New York bank, who was alleged to have embezzled bank funds and concealed the theft by making certain false entries in his employer's books of account. In essence, the issue before the court was whether the alleged falsification constituted common law forgery within the ambit of an 1842 extradition treaty. Concluding that Windsor's acts did not amount to forgery, Justice Blackburn wrote:

> "Now the charge that is made out against this person is that he, being a clerk in a bank, did steal a large sum of money, and in order to conceal it did make an entry in a book, which entry, as I make it out, was an entry stating on his behalf that a certain quantity of specie had been deposited in the vaults, whereas, in point of fact, the statement was wilfully and fraudulently false, with the intention to conceal and embezzle. But though he was guilty of that crime, it did not amount to forgery. Forgery is the false making of an instrument purporting to be that which it is not; it is not the making of an instrument which purports to be what it really is, but which contains false statements. Telling a lie does not become a forgery, because it is reduced into writing." 10 Cox. Cr. Cas. at 123.

*Accord, In re Tully,* 20 F. 812, 817 (S.D. N.Y. 1884) (interpreting English law); *State v. Young, supra,* 46 N.H. at 270 (it is not forgery for a man to make false charges or falsely to alter charges in his own account, since it is his own true writing, "as much if the charge is false as though it were true."); *R. v. Blackstone,* 4 Man. 296, 299 (Q.B. Man. 1887);

see *DeRose v. People, supra,* 171 P. at 360 (making of false entry in railroad time sheet held not forgery). In *Re Hall,* 8 Ont. App. 31, 46-47 (1882), a case remarkably similar to the one at hand, Judge Burton cogently observed:

> "In the present case the account may or may not have contained false entries, but still it is what it purports to be, it would be [the prisoner's] own true writing; however false the statement it contained, when he alters those entries to make them more true or more false, so far as the matter referred to in the entry is concerned, still it remains what it purports to be, his account. The character of the account as being false or fictitious instead of genuine is not altered by the truth or falsity of the statement that it contains."

There is, however, considerable authority to support the view that the making of false entries in a book of account *is* forgery. The leading case is *Biles v. Commonwealth,* 32 Pa. (8 Casey) 529, 75 Am. Dec. 568 (1859), where the defendant, a bookkeeper, was charged with having made a false and fraudulent entry in the account ledgers of his employer. In upholding the defendant's conviction for forgery, the Pennsylvania Supreme Court declared:

> "[W]e are unable to see, that this false entry does not amount to forgery, and one of the most dangerous to the community. For if false entries in the books of a mercantile firm, can be made by a confidential clerk and book-keeper, with impunity, then all confidence in their accuracy must be destroyed." 32 Pa. at 537.

*Accord, People v. Fallon,* 202 N. Y. 456, 96 N. E. 96, 98 (1911) (dicta); *People v. Herzog,* 47 Misc. 50, 93 N.Y.S. 357, 360 (1905) (dictum); *State v. Zimmerman,* 79 S. C. 289, 60 S. E. 680, 682 (1908) ("a false entry made in a public record, with intent to deceive and defraud, is a forgery") (dictum); *Re Hall, supra,* 8 Ont. App. at 36 (per Spragge, C.J.O.) (false alteration of figures in municipal book of account is forgery).

To the extent that they even articulate grounds for their conclusions, none of these latter decisions has ever squarely confronted the problem of falsity. Instead the primary emphasis in these cases was directed to whether books of account are writings within the contemplation of the common law. *See, e.g., Biles v. Commonwealth,* 32 Pa. at 538. But, as we have seen, this question is clearly distinguishable from that of whether a writing such as a book of account is rendered false by reason of false statements contained therein. Turner, *Documents in the Law of Forgery,* 32 Va. L. Rev. 939, 947 (1946). The failure of *Biles* and related decisions to take account of this fundamental conceptual distinction severely undermines their persuasiveness as legal precedent. In fact these courts seem prompted less by a concern for the rigors of legal analysis than they were by a desire to reshape in radical fashion the basic tenets of common law forgery so as to effectuate their own perceptions of social policy. *See Re Hall,* 8 Ont. App. at 70 (per Patterson, J.) (severely criticizing the *Biles* opinion); *and see State v. Young, supra,* 46 N. H. at 270-71 (questioning the soundness of the *Biles* analysis).

However flexible and forward-looking the common law may be and indeed ought to be in other contexts, *see State v. Williamson,* 282 Md. 100, 114-15, 382 A. 2d 588 (1978) (Levine, J., concurring), courts should, for reasons rooted primarily in constitutional law, be extremely reluctant to enlarge the limits of *substantive* criminal liability through the device of ascertaining and declaring the common law. *See* W. LaFave & A. Scott, *Handbook on Criminal Law* § 9, at 67-69 (1972); *and see Bouie v. City of Columbia,* 378 U. S. 347, 353-54, 84 S. Ct. 1697, 12 L.Ed.2d 894 (1964); *People v. Brengard,* 265 N. Y. 100, 191 N. E. 850, 853, 93 A.L.R. 1465 (1934); *but see Commonwealth v. Branch,* 207 Pa. Super. 137, 215 A. 2d 392, 394 (1965). For these reasons, we decline to follow the *Biles* line of authority, and hold that it is not forgery for an individual to make false and fictitious entries in a tax roll or other book of account.[6]

---

6. Recognizing the shortcomings of common law forgery, many jurisdictions have enacted false entry statutes declaring it a crime to engage in the kind of conduct attributed to appellee in the case at hand. *See, e.g., Sims v. State,* 169 Tex. Crim. 466, 334 S.W.2d 818, 820 (1960). In the final

## II

Finally, the State contends that appellee's entries in the Kent County tax rolls should be considered the equivalent of "acquittances or receipts" within the purview of Article 27, § 44. Under this approach, every entry would be viewed as a separate instrument in the nature of a taxpayer's receipt for property taxes paid. If the State's characterization of the tax roll entries is correct, there would be no difficulty in establishing the falsity element of the offense, since every entry would, by definition, be a completely false writing in itself, irrespective of the genuineness of the greater document of which it is a part. *See Commonwealth v. Biles,* 3 Phila. 350, *aff'd,* 32 Pa. (8 Casey) 529, 75 Am. Dec. 568 (1859); *Re Hall,* 8 Ont. App. at 36 (per Sprugge, C.J.O.); *cf. R. v. Moody,* 9 Cox. Cr. Cas. 166 (Ct. Cr. App. 1862); *R. v. Harrison,* 1 Leach 189 (K.B. 1777) (holding entry of false charge in banker's passbook is "accountable receipt" within meaning of forgery statute).

It will be recalled that when tax payments are remitted to the Kent County Treasurer's office, taxpayers are given a stamped copy of the tax bill to serve as a receipt. Despite this, the State points out that the custom in Kent County is to look to the tax rolls for proof of payment, rather than to the receipted duplicate tax bills themselves. In this way, it is argued, individual notations in the tax rolls are the functional equivalents of receipts or acquittances.

Appealing as the State's position may be, it nevertheless conflicts with certain provisions of Article 81 pertaining to the nature and use of tax rolls in the several counties. Article 81, § 46, quoted earlier, requires the supervisors of assessments of each county to deliver to county tax collecting authorities, tax rolls or books "showing the valuation and assessment of all taxable property" in the county. Moreover, Article 81, § 60 specifies the purpose for which these tax rolls are to be used by county collectors:

> "Every collector receiving the tax rolls provided for in § 46 of this article . . . shall proceed to collect the

analysis it is the responsibility of the Legislature to delineate the bases for criminal liability.

taxes due thereon and payable to him with any penalty or interest imposed by law, and shall pay the county ... taxes collected to the county commissioners ... or their order, not later than the tenth day of each month . . . ."

Thus the statutorily defined purpose of maintaining the tax rolls is to assist local tax officials in the collection of county revenues. In other words, the tax rolls are intended to aid in the enforcement of the tax laws, *see Babcock v. Township of Beaver Creek,* 64 Mich. 601, 31 N. W. 423, 424 (1887); they are not designed to function primarily as tax receipts. Furthermore, since the Kent County tax rolls are creatures of state law exclusively, it is immaterial that local custom has assigned to them a significance not mandated by statute. We therefore hold that the entries made by appellee in the tax rolls of Kent County are not acquittances or receipts for the payment of money or other property within the meaning of Article 27, § 44.

*Judgment of the Court of Special Appeals affirmed; costs to be paid by the County Commissioners of Kent County.*