50 A.3d 591

**STATE of Maryland**

v.

**Isaac NEGER.**

**No. 108, Sept. Term, 2011.**

Court of Appeals of Maryland.

Aug. 20, 2012.

Mary Ann Ince, Asst. Atty. Gen. (Douglas F. Gansler, Atty. Gen. of Maryland, Baltimore, MD), on brief, for Petitioner.

Norman L. Smith (Jeffrey E. Nusinov of Law Offices of Arnold M. Weiner, Baltimore, MD), on brief, for Respondent.

Argued before BELL, C.J., HARRELL, BATTAGLIA, GREENE, ADKINS, BARBERA and McDONALD, JJ.

BARBERA, J.

Maryland Code (2002 & 2010 Supp.), § 8–601 of the Criminal Law Article (CR) provides, in pertinent part: "(a) *Prohibited.*—A person, with intent to defraud another, may not counterfeit, cause to be counterfeited, or willingly aid or assist in counterfeiting any[ ] . . . (3) deed." At a bench trial in the Circuit Court for Baltimore City, the Honorable Gale Rasin convicted Respondent, Isaac Neger, of violating § 8–601, finding "beyond a reasonable doubt that the deed . . . [Respondent] caused to be presented for recordation contained material alterations as to material elements, including the grantor and grantee, and basically this is a fraud on the system of recording deeds." Respondent appealed to the Court of Special Appeals, which reversed the conviction. We granted the State's petition for writ of certiorari, *State v. Neger,* 424 Md. 291, 35 A.3d 488 (2012), to review the following question:

Did the Court of Special Appeals incorrectly reverse [Respondent's] conviction for counterfeiting, based on its conclusion that the evidence was insufficient to show an intent to defraud another, notwithstanding its agreement that [Respondent] recorded a deed he had altered, as to the owners of the property in question, to conform to his belief as to ownership?

For the reasons that follow, we shall reverse the judgment of the Court of Special Appeals and reinstate Respondent's conviction.

I.

The evidence at trial established the following undisputed background account.[1] In 1990, Respondent entered into an

---

1. As shall become clear, the primary factual issues in dispute at trial related to whether Respondent himself had, or caused to have, altered

agreement with a man named Ephraim Ohana "to take title" to the property at issue, located at 300 S. Robinson Street, Baltimore, Maryland, 21224 (hereafter the Property). The two men intended to form a corporation known as "E & I Associates [2] owned equally by both parties," but no such entity ever was registered with the State Department of Assessments and Taxation. The parties' written agreement explained that Respondent would be responsible for settlement expenses, including the purchase price, for a total amount of $38,722.66. Mr. Ohana would be responsible for paying 10% annually on that amount, interest only, as well as for the normal maintenance and running expenses. A deed was recorded in Baltimore City on December 5, 1990, listing the grantor as Lorraine G. Izner and the grantees as Ephraim Ohana and E.I. Associates, Inc. Respondent was not listed as a grantee.

In 1995, Mr. Ohana and his then-wife Cynthia Ohana filed for bankruptcy. In connection with those proceedings, the Ohanas filed a Statement of Intention indicating that they would surrender the Property to Respondent. In 2000, Mr. Ohana executed a power of attorney authorizing Respondent to sell the Property. In July 2000, Respondent signed and had a notary sign a document drafted by Mr. Ohana—according to Mrs. Ohana's testimony that she recognized the handwriting as that of Mr. Ohana—acknowledging that, since 1992, Respondent had "taken over all rights and interest from Ephraim Ohana in the Property." From 1990 until the deed at issue in this matter was recorded in 2008, no deed was recorded affecting the ownership of the Property.

---

the deed in question and, if so, whether he had acted with the intent to defraud.

2. The record reflects slightly different spellings of the name of this entity: "E. & I. Associates" or "E & I Associates" and "E.I. Associates" or "EI Associates." We have used all references throughout the opinion to be faithful to the record. To be clear, though, all names refer to the same entity.

On May 26, 2005, the Ohanas' divorce action was heard in the Circuit Court for Baltimore City. In the Judgment of Absolute Divorce, the Circuit Court designated one-half interest in the Property as the Ohanas' marital property, evidently based on Mr. Ohana's being listed as one of the two grantees in the 1990 deed and there being no subsequent recording affecting that interest. The court valued that interest in the Property at $110,000. The court also awarded Mrs. Ohana a monetary award in the amount of $70,000. The court ordered that the award be reduced to judgment immediately, thereby evidently creating a lien on the Property.[3]

In 2007, Respondent, representing himself as the owner, entered into a contract to sell the Property. He sought to secure a release of Mrs. Ohana's lien on the Property. Mrs. Ohana, however, following the advice of her counsel, Mr. Larry Feldman, declined to grant the release.

Mr. Feldman communicated directly with Respondent, by telephone and in writing, with respect to the Property. In a letter dated April 30, 2007, Mr. Feldman wrote to Respondent

---

3. There was much discussion during Respondent's trial in the present case regarding the effect of the divorce court's order. The judgment of absolute divorce did not award Mrs. Ohana the Property or make a determination as to the ownership of the Property, as among Mr. Ohana, Respondent and E. & I. Associates. The judgment of divorce merely determined that the Property was "marital property" for purposes of determining a monetary award due to Mrs. Ohana. *See* Md.Code (1999, 2006 Repl.Vol.), §§ 8–203 through 8–205 of the Family Law Article (FL). Mrs. Ohana's divorce attorney testified at Respondent's trial, explaining that the judgment automatically became a lien on the Property because the court reduced the award to judgment and the Property was located in the same county (or, here, Baltimore City) as the court that entered the judgment. *See* Md.Code (1974, 2006 Repl.Vol.), § 11–402(b) of the Courts and Judicial Proceedings Article ("If indexed and recorded as prescribed by the Maryland Rules, a money judgment of a court constitutes a lien to the amount and from the date of the judgment on the judgment debtor's interest in land located in the county in which the judgment was rendered...."). *But see E. Shore Bldg. & Loan Corp. v. Bank of Somerset*, 253 Md. 525, 531, 253 A.2d 367, 370 (1969) (holding that where judgment debtor is a joint tenant, as compared to a tenant in common, unless the joint tenancy is severed, such as by execution of the judgment or a contract for sale by one joint tenant, the judgment lien will not attach to the property).

that, since the 1990 transfer from Ms. Izner to Mr. Ohana and E.I. Associates, "[t]here have been no subsequent transfers of this property, as your [sic] indicated to me there were, up until the present." Mr. Feldman further wrote, "[i]n lieu of backing out of your valid contract to sell this property . . . why don't you just proceed with assuring your [sic] will get the EI share of the property and allow Ephraim's share to be paid to my client."

Respondent thereafter cancelled the sale. He sent by facsimile to Mr. Feldman a handwritten response to Mr. Feldman's letter simply indicating that he had cancelled the sale. Respondent subsequently sent Mr. Feldman another handwritten facsimile, in response to further correspondence, stating, "Once again this sale has been *cancelled.* We will be taking this issue to [the Rabbinical court] for their decision on property ownership." On May 21, 2007, Respondent also communicated his cancellation of the intended sale by sending a message via facsimile to his realtor. The message stated, "This is to advise that due to legal issues we cannot deliver title to this property, I am sorry for any inconvenience."

### Recordation of the deed at issue

On June 5, 2008, a deed dated May 25, 2005, transferring the Property from "Ephraim Ohana, sole owner of E.I. Associates, Inc." to "Isaac Neger," was recorded in the land records in Baltimore City. Upon learning of that recorded deed, Mr. Feldman contacted the State's Attorney's Office, which evidently opened an investigation. Ultimately, a Baltimore City grand jury returned an indictment filed on October 13, 2009, charging Respondent with a violation of CR § 8–601(a)(3). As mentioned, Respondent elected a court trial.

The State sought to prove that a deed was prepared by Commerce Title Company, executed by Mr. Ohana and Respondent, and signed by a notary on May 25, 2005 (perhaps merely coincidentally, the day before the Ohanas' divorce action was heard in Circuit Court), though never signed by the attorney whose name appeared on the deed as having prepared it. That deed listed the grantees from the 1990 deed—

Ephraim Ohana and E.I. Associates, Inc.—as the grantors, and listed E.I. Associates, Inc. as the sole grantee. The State further sought to prove that the 2005 deed was never recorded; rather, Respondent maintained possession of the unrecorded deed, altered the grantor to "Ephraim Ohana, sole owner of E.I. Associates, Inc." and the grantee to "Isaac Neger," forged the attorney's signature, and sought the assistance of a different title company, All Star Title Company, to have the deed recorded.

The State presented several witnesses and introduced several documents into evidence in support of its case. Mr. Ellie Newman, the vice president of Commerce Title Company, testified that in January 2001 his company opened a file related to the Property and described the seller as Ephraim Ohana and the buyer as E & I Associates, Inc. A deed was then prepared that would have transferred the Property from Ephraim Ohana and E.I. Associates, Inc. to E.I. Associates, Inc., but that deed was never executed. An invoice was issued to Respondent for document preparation and attorney's fees, as Mr. Newman testified, with respect to the file opened in January 2001. Then, in April 2004 another file was opened at Commerce Title Company regarding the Property, listing the seller as Ephraim Ohana and directing that a judgment search be conducted on the property. Mr. Newman also testified that the recorded deed, though it bore the name of the Commerce Title Company attorney, did not appear to have been signed by that attorney. Mr. Newman further testified, though, that the attorney authorized others, in his absence, to sign his name by a "facsimile stamp signature." On cross-examination Mr. Newman testified that a "confirmatory assignment" dated May 5, 2004, introduced by the defense, bore a Commerce Title file number. The assignment intended to correct a purported error on the 1990 deed that had transferred the property from Ms. Izner. According to the document itself, a confirmatory deed was

> being executed and recorded for the purposes of correcting the name of the Grantee. Whereas the Party of the Second Part (Grantee) was erroneously referred to as Ephraim

Ohana and E.I. Associates, Inc. and it was the intention of the parties hereto that the property be conveyed to the correct Party of the Second Part (grantee) Ephraim Ohana and Isaac Neger this assignment is being recorded for the purpose of correcting said error and confirming the grant unto of the property described herein unto the correct grantee Ephraim Ohana and Isaac Neger.[4]

The State also called Mr. James Holderness, the owner of the former All Star Title Company. Through Mr. Holderness, the State introduced the file pertaining to the Property from All Star Title Company. Mr. Holderness testified that the deed in the All Star file had not been prepared by All Star. That deed, dated May 25, 2005, signed by Mr. Ohana and Respondent, as "sole acting director of E & I Associates, Inc.," and notarized, purported to transfer the property from "Ephraim Ohana and Isaac Neger, sole acting director of E & I Associates" to "Isaac Neger." The All Star file, which had been admitted into evidence, contained a disbursement statement indicating that disbursements had been made to the Director of Finance and the Clerk of the Circuit Court on May 14, 2008 and June 5, 2008. The All Star file also contained a recording receipt from the Clerk of the Court. The All Star file, however, did not contain a copy of the deed that All Star recorded.

Respondent defended the counterfeiting charge on the ground that there was no evidence to support that the changes to the signed deed of May 25, 2005 were made without authorization of all parties or, alternatively, while in the hands of All Star Title. He argued that the evidence affirmatively demonstrated the absence of fraudulent intent in connection with any action he undertook.

In support of that argument, Respondent called Mrs. Ohana

---

4. Ms. Izner's death certificate listing December 2, 2004 as the date of her death was introduced by the State and admitted into evidence. The Defense argued that Ms. Izner's death was the reason the May 2004 deed was never executed.

to testify.[5]  Mrs. Ohana explained, *inter alia*, that she and her husband had intended to surrender the Property to Respondent pursuant to the bankruptcy proceedings.  Mrs. Ohana also testified that, at some point after the initial 1990 transfer, problems arose with the Property, and "the solution for this property was ... they entered into an agreement-a written agreement where Mr. Ohana was just walking away from the property and giving it back to [Respondent]."  Mrs. Ohana continued that, during the divorce proceedings in 2005, she "was surprised to learn that in fact Mr. Ohana was still titled the owner of the property," and her "intent was not to satisfy the judgment ... by foreclosing on [the Property]."

After hearing argument of counsel, the court reconciled the evidence, made factual findings, and found Respondent guilty of counterfeiting.  In light of Respondent's arguments based on the court's specific findings, it is necessary to include those findings verbatim and in their entirety.  The court explained:

> The people involved in this case, that is Mr. Ohana and the Defendant, were experienced businessmen involved in many real estate transactions, and the Defendant, based upon the testimony of the person from All Star ... Title, the extent of his businesses is very wide.  I believe the witness testified he represented the Defendant in his creditor rights business or something.  So he's got a travel agency, he apparently owns and sells-buys and sells real estate and rents it, and hold mortgages.  So-and according to Mrs. Ohana was represented by at least '07/'08 by an attorney whom he deemed to be an expert.  So he's not some ignorant, innocent roaming around trying to figure out how to get ownership title to this property.

> I need not find this, but I suspect there was no mistake back in 1990 when this property was titled, that for whatever reason the Defendant did not want it titled in his name.  Whether it was for protection of assets, I don't know, it

---

5. Respondent elected not to testify.

doesn't matter, but because it's not-I need not make a finding.

But what I believe is that at some point because Mr. Ohana was not presumably paying him what he was supposed to pay him for his interest in the property or for whatever deal, he wasn't holding up his end of whatever deal they actually had, the Defendant decided that he better make a change.

He was the client of Commerce Title. He directed the president of Commerce Title initially to change the ownership to EI Associates. Now maybe that was because he believed the document that I did permit into evidence, the surrender or whatever it was,[6] that he then became the exclusive owner of EI Associates and therefore if the transfer was made as he first requested that would give him ownership, again not in his name, he would be protected by some pseudo corporate name. But no deed was recorded. And again, I don't know why.

But one thing I am convinced of beyond a reasonable doubt is that the deed that was recorded in 2008 is not the deed that was prepared by Commerce Title at any point, and assuming Mr. Ohana actually executed a deed, and I assume he did in the presence of the notary, the deed Mr. Ohana signed is not the one that was recorded in 2008.

I find sufficient circumstantial evidence to be convinced beyond a reasonable doubt that the Defendant was the moving party in all of this. That I believe Mrs. Ohana, that Mr. Ohana basically washed his hands of this. And Mr.— the Defendant truly believed this was his property as a matter of equitable title or whatever, he may not have called it that, and so when he protested to Mr. Feldman this is my

---

6. The court evidently was referencing defense exhibit 23, which was signed by Respondent and prepared by Mr. Ohana, according to Mrs. Ohana's testimony. The document represents, in part, that Respondent agreed to take over "all rights and interest from Ephraim Ohana in the Property 300 S. Robinson St. Baltimore MD. since 1992. Including but not limited to, all responsibilities, both financially and in regard to civil matters."

property he believed it. But having equitable title and having put the money up for a piece of property is not the same thing as being the record owner, and that's why he discovered—he discovered in 2007 that the formalities required something better than what he had. And so I believe that's why he went—even though the file doesn't bear his name as the—as the client—and the funds apparently didn't come from him ... The money for the disbursement came from Prime Time, but the State's investigator made an evidentiary connection between the Defendant and Prime Time. That's a link in the chain.

All Star didn't prepare this deed. I don't care—I can't imagine, although it is theoretically possible, that a client [7] of All Star took a deed prepared by another lawyer and whited out and Isaac Neger, sole owner of E & I Associates, and white all that out and wrote on top of it, 'Sole owner of EI Associates." I do not find that to be credible.

I believe the only reasonable inference once again was the Defendant was maintaining control over the original deed that was prepared and signed, perhaps back in May of 2005, who knows, and that he made the changes to it and made the ultimate change and gave it to All Star to record. While—and that it was—and I$_{o}$ find beyond a reasonable doubt it was not signed by the attorney whose name is typed there.

And while one may speculate that Mr. Davis [8] I believe signed it because the Commerce Title [9] witness recognizes the A, I'm not buying that, and I don't believe that.

So are these changes material? Is this a counterfeit? I find it's material and this is a counterfeit, and that our

---

7. Based on the testimony, it is likely that the court intended to say "employee" instead of "client."

8. Mr. Davis was a former employee of All Star.

9. The trial court likely intended to refer to All Star, as Mr. Holderness testified that the attorney's signature looked like Mr. Davis's signature, in particular the "A" of the attorney's name.

system of land records, which I guess goes back to the founding of the colony presumably, depends upon the register of deeds being able to accept at face value that the deed presented for recordation, regardless of how sloppy and messy it is, as this indeed is, is the deed that the parties signed and accurately—and shows who the grantor or grantors are and who the grantees are.

That is simply I find beyond a reasonable doubt that the deed—State's Exhibit 7—that the Defendant caused to be presented for recordation contained material alterations as to material elements, including the grantor and grantee, and basically this is a fraud on the system of recording deeds. This is a fraud on our system of having reliable title records.

And his belief, even if it was a good faith belief that this was his property, that it had always been his property, that he'd paid for the property, does not dissipate the intent to do—the intent to have a deed filed which was altered in a material way.

For those reasons I find—granted after much pressing the State on the theory, asking the State hypotheticals, being the devil's advocate, I am—posing every possible what if this, what if that, I did all that because in a court trial . . . the Court has a very heavy burden, what the jury bears, that level of conviction of proof beyond a reasonable doubt, and I asked all those questions because I wanted to eliminate all reasonable possibilities and explanations. And while I wasn't always satisfied with every answer I received, in the end the evidence tells the story, and the Defendant as of '07 acknowledged he didn't have record title, although he protested he owned the property, and for whatever his personal reasons were, which I cannot fathom, he proceeded in this manner to serve his own interests, whatever they might have been at the time.

So being convinced beyond a reasonable doubt that the Defendant had the intent to defraud and caused to be made material alterations in a previously executed deed I find him guilty.

Respondent timely appealed the conviction to the Court of Special Appeals, which, in an unreported opinion, reversed the judgment of the Circuit Court. The Court of Special Appeals reasoned that, in CR § 8–601, the specific intent requirement of the "intent to defraud another" refers to another "person." The intermediate appellate court reasoned that the Circuit Court had not found that Respondent intended to defraud another person, but rather "the system"; consequently, there was insufficient evidence to support the specific intent element of the crime, necessitating reversal. This Court's grant of certiorari followed.

## II.

The State challenges the Court of Special Appeals's holding that CR § 8–601's specific intent element that a defendant have acted with " 'the intent to defraud another[ ]' requires proof of a specific individual person who was defrauded as a result of the counterfeiting." The State argues that there was sufficient evidence for the Circuit Court to conclude, as it did, that Respondent acted with the intent to defraud the system of recording when he materially altered and recorded the deed, satisfying the specific intent element.

Respondent, while agreeing that the "intent to defraud does not require an identified victim who suffered a pecuniary loss," contends that "the Trial Court here found only a fraud on the 'system of recording deeds,' but readily acknowledged that 'I don't know if anybody was financially defrauded.' " (Footnote omitted.) Respondent's argument focuses on the rule that a good faith belief is a complete defense to the specific intent element of CR § 8–601 because good faith factually negates the intent to defraud. In that vein, Respondent asserts that "the evidence at trial was more than sufficient to generate [Respondent's] defense of a good faith belief and to support the Trial Court's finding that he truly believed he was the equitable [10] owner of the Property."

---

**10.** Both parties and the trial court described Respondent's interest in the Property as an "equitable" interest, and we shall employ that term as well.

Whether the defendant was tried by a judge or jury, the evidence must be such as would permit a rational fact finder to find, beyond a reasonable doubt, every element of the charged offense. *See Spencer v. State*, 422 Md. 422, 433–34, 30 A.3d 891, 898 (2011). When the conviction is rendered after a bench trial, we "review the case on both the law and the evidence." Md. Rule 8–131(c). We "will not set aside the judgment of the trial court on the evidence unless clearly erroneous, and will give due regard to the opportunity of the trial court to judge the credibility of the witnesses." *Id.* The clearly erroneous standard, however, "does not, of course, apply to legal conclusions." *Clancy v. King*, 405 Md. 541, 554, 954 A.2d 1092, 1099 (2008) (quoting *Nesbit v. Gov't Emps. Ins. Co.*, 382 Md. 65, 72, 854 A.2d 879, 883 (2004)). For legal conclusions, we conduct a non-deferential review. *Id.*, 954 A.2d at 1099. *See also Toth v. State*, 393 Md. 318, 324, 901 A.2d 820, 823 (2006) (performing *de novo* review of issues involving Maryland statutory interpretation and application). The issue before this Court involves, as we shall see, a review of both the law and the evidence.

### A. *"Intent to defraud another"*

We begin with the State's contention that CR § 8–601 does not require proof that Respondent acted with the intent to defraud another person in particular. In our review of that provision, we are guided by the familiar rules of statutory interpretation. We seek "to ascertain and effectuate the intent of the Legislature ... begin[ning] with the plain language of the statute, and ordinary, popular understanding of the English language dictates interpretation of its terminology." *Bowen v. City of Annapolis*, 402 Md. 587, 613, 937 A.2d 242, 257 (2007) (quoting *Kushell v. Dep't of Natural Res.*, 385 Md. 563, 576, 870 A.2d 186, 193 (2005)). We also seek to harmonize "various consistent and related enactments, although made at different times and without reference to one another." *Pete v. State*, 384 Md. 47, 65, 862 A.2d 419, 429 (2004) (quoting *State v. Bricker*, 321 Md. 86, 93, 581 A.2d 9, 12 (1990)).

Respondent was convicted of violating CR § 8–601, which provides, in pertinent part: "(a) *Prohibited.*—A person, with intent to defraud another, may not counterfeit, cause to be counterfeited, or willingly aid or assist in counterfeiting any . . . (3) deed." "Counterfeit," in turn, is defined as "to forge, counterfeit, materially alter, or falsely make," CR § 1–101(c), consistent with case law recognizing the synonymity of the terms "falsely make," "forge," and "counterfeit." *Reese v. State,* 37 Md.App. 450, 457, 378 A.2d 4, 8 (1977), *aff'd,* 283 Md. 86, 99, 388 A.2d 122, 130 (1978).

The Criminal Law Article, including § 8–601, was enacted in 2002 as a part of the recodification plan for the Maryland Code.2002 Md. Laws ch. 26. The Revisor's Note following § 8–601 indicates that the section constitutes "new language derived without substantive change from former Art. 27, § 44(a)." The Note further explains that "the reference to the intent of a person to defraud 'another' is substituted for the former reference to the intent of a person to defraud 'any person whomsoever' for consistency within this subtitle." The revision added the definition of "person," applicable to the entire article, as "an individual, sole proprietorship, partnership, firm, association, corporation, or other entity." CR § 1–101(h). Formerly, "person" had been defined only in some separate subsections of Article 27, not applicable specifically to former § 44, now CR § 8–601. *See* Revisor's Note to CR § 1–101(h). The plain language of CR § 8–601, particularly when construed in conjunction with the Revisor's Notes, then, requires a defendant to have acted with the intent to defraud another person, as that term is defined for purposes of the Criminal Law Article.

■ This does not resolve the issue, however, because we still must determine whether the State was required to prove a particular person who Respondent intended to defraud.[11]

---

11. The Court of Special Appeals cited our decision in *Ishola v. State,* 404 Md. 155, 945 A.2d 1273 (2008), for the proposition that "the most reasonable interpretation of the intent to defraud 'another' . . . would be the intent to defraud an additional one of the same kind, that is, an

To answer that question, we look to other pertinent provisions in the Criminal Law Article so as to harmonize our construction of CR § 8–601 with those other sections. *See Pete,* 384 Md. at 65, 862 A.2d at 429 (recognizing the rule of statutory construction that statutes affecting the same subject matter shall be construed in harmony with one another). In particular, we turn to CR § 1–401. That section, entitled "Proof of intent—Fraud, theft and related crimes," provides:

> In a trial for counterfeiting, issuing, disposing of, passing, altering, stealing, embezzling, or destroying any kind of instrument, or theft by the obtaining of property by false pretenses, it is sufficient to prove that the defendant did the act charged with an intent to defraud **without proving an intent by the defendant to defraud a particular person.**

(Emphasis added.) Self-evidently the State was not required to prove that Respondent acted with the intent to defraud a particular person.

This Court's decision in *Reddick v. State,* 219 Md. 95, 148 A.2d 384 (1959), *cert. denied,* 360 U.S. 930, 79 S.Ct. 1448, 3 L.Ed.2d 1544 (1959), demonstrates how the specific intent element for forgery operates. In that case, Reddick, the former Secretary–Treasurer of the Board of Medical Examiners, representing the Maryland State Homeopathic Medical Society, had been permanently enjoined from issuing medical licenses. *Id.* at 97, 148 A.2d at 385. Despite the injunction, Reddick issued a license to an automobile mechanic who

additional person." The issue in *Ishola* was whether the reference to "another" in Maryland Code (2002 & 2007 Supp.), § 8–301 of the Criminal Law Article (CR), which provides that " '[a] person may not knowingly and willfully assume the identity of another' for certain purposes," was broad and included any other identity, including that of a fictitious person. *Id.* at 160, 945 A.2d at 1276 (quoting CR § 8–301). We strictly construed CR § 8–301 and concluded that "another" did not include fictitious persons, as "[t]he Legislature has ... explicitly used the term 'fictitious person' in several other statutes." *Id.* at 162–63, 945 A.2d at 1277. Neither the legal claim presented in *Ishola,* nor the statute we reviewed in that case is at issue in the case *sub judice.* Thus, *Ishola* does not inform our analysis here. Moreover, in the context of CR § 8–601, the statute at issue before us here, we believe the meaning of "another" is clear.

lacked the requisite qualifications. *Id.*, 148 A.2d at 385. In affirming the forgery and uttering counts of Reddick's conviction, the Court recognized:

> It is true that because of the outstanding injunction and notice to the various Clerks of Court, the purported license could probably not have been recorded in Maryland, as required by law; but its possession by the licensee might in itself have sufficed to work a fraud on the public, in this State or elsewhere. Intent to defraud may relate to persons not named in the indictment, or to the public generally. It is not necessary to allege in an indictment for forgery or uttering, or to prove, that it was the intent of the defendant to defraud any particular person.

*Id.* at 99, 148 A.2d at 386 (citations omitted). Because the license could have defrauded a member of the public, although it was unknown who it would have defrauded in particular and with certainty, the indictment sufficiently alleged the specific intent of forgery.

█ Respondent attempts to distinguish *Reddick* based on its facts, but we are not persuaded that the differences between *Reddick* and the matter *sub judice* are material to the analysis. Respondent asserts that Reddick knew the license purchaser would use the license to defraud the public, but here the Circuit Court found only that Respondent acted with an intent to defraud the "system of recording deeds," while acknowledging, "I don't know if anybody was financially defrauded."[12] In seeking to create a distinction, Respondent overlooks what a fraud on the "system of recording deeds" actually means. The trial court correctly explained that "our

---

12. Respondent emphasizes, as did the intermediate appellate court, that the trial court acknowledged that it was unaware whether any person had actually been defrauded financially. We note, though, that proof of an intent to defraud does not require that anyone actually be defrauded. *See Draper v. State*, 231 Md. 423, 426, 190 A.2d 643, 645 (1963) (holding that the evidence was sufficient to support a conviction of forgery where a permissible inference was that the defendant obtained another's checks and signed that person's name to them, noting that "[t]he fact that the check was not indorsed or negotiated is not determinative").

system of land records ... depends upon the register of deeds being able to accept at face value that the deed presented for recordation ... is the deed that the parties signed and accurately—and shows who the grantor or grantors are and who the grantees are." The trial court further elaborated that an unauthorized, material alteration contained in a deed constituted "a fraud on our *system of having reliable title records.*" (Emphasis added.) The fraud stems not from the mere fact that the materially altered deed was recorded, but also from the fact that such recording interferes with future purchasers, insurers, and creditors' ability to rely on the information, with respect to the chain of title, reflected in the deed.

A fraud on the system, therefore, is a fraud committed on any and all persons who rely upon the accuracy of a deed's representations. Just as we were sure in *Reddick* that some person would rely on the facial validity of the medical license, we can be sure here that some person in the future would have relied on the accuracy of the recorded deed, even though we do not know who that person is. Therefore, the intent to defraud the system of recordation is an intent to defraud all future purchasers and creditors, as well as the general public.

We hold that the trial court's finding that Respondent had committed a fraud on the system of recordation satisfies the specific intent element of CR § 8–601 that a defendant have acted with the "intent to defraud another."

### B. Good faith defense

■ We turn now to Respondent's argument that the trial court found Respondent to have acted "in good faith," thereby negating the finding of intent to defraud. To begin, we agree with Respondent that good faith generally negates a finding of intent to defraud, and, therefore, good faith is a complete defense to a crime with the specific intent to defraud. *See Ferguson Trenching Co. v. Kiehne*, 329 Md. 169, 186, 618 A.2d 735, 743 (1993) (noting that " 'intent to defraud' ... requir[es] dishonesty or bad faith by the defendant" and citing a jury instruction approved in federal court stating, in part, that "[g]ood faith constitutes a complete defense to one charged

with an offense of which fraudulent intent is an essential element"). We do not agree, however, that the trial court actually found that Respondent acted in good faith.

The trial court's findings include two references to the concept of good faith. The trial court alluded to the concept for the first time when remarking:

> That I believe Mrs. Ohana, that Mr. Ohana basically washed his hands of this. And Mr.—the Defendant truly believed this was his property as a matter of equitable title or whatever, he may not have called it that, and so when he protested to Mr. Feldman[,] [Mrs. Ohana's divorce attorney, in 2007,] this is my property he believed it.

Importantly, this finding was preceded by the trial court's findings that Respondent was an "experienced businessm[a]n involved in many real estate transactions" and "was represented by at least in '07/'08 by an attorney whom he deemed to be an expert." The court continued, "So he's not some ignorant, innocent roaming around trying to figure out how to get ownership title to this property." The court credited Mrs. Ohana's testimony that her ex-husband had intended to cede the Property to Respondent. Moreover, the court found that Respondent believed he had some interest in the Property and, when Respondent spoke with Mrs. Ohana's attorney in 2007, he "truly believed" the Property was his.

> The trial court did not stop there, however, and continued:

> But having equitable title and having put the money up for a piece of property is not the same thing as being the record owner, and that's why he discovered—he discovered in 2007 that the formalities required something better than what he had. . . .

> \*　　\*　　\*

> I believe the only reasonable inference once again was that the Defendant was maintaining control over the original deed that was prepared and signed . . . and that he made the changes to it and made the ultimate change and gave it to All Star to record.

These subsequent findings reflect the trial court's understanding of the progression of events. That is, in 2007, when Respondent spoke with Mr. Feldman (Mrs. Ohana's divorce lawyer), based on the evidence presented, Respondent maintained a good faith belief that the Property equitably was his, but that belief was undermined when he learned that he did not possess legal title to the Property. The trial court recognized the distinction between legal and equitable title, as well as that Respondent was experienced in real estate matters and was represented by counsel. After Respondent learned that the title to the Property had never been transferred to him, even though he might have had a valid claim to it,[13] he could not have maintained a good faith belief in his actual legal ownership. The trial court found explicitly that Respondent knew he did not possess legal title to the property, and so he chose to alter material elements of a previously executed deed in an attempt to acquire legal title.

The record supports the court's finding that Respondent knew he did not have legal title to the Property. Mr. Feldman testified that he communicated with Respondent about the Property, which he had learned in the course of the Ohanas' divorce proceeding was titled to EI Associates and Mr. Ohana, and not Respondent, and that no subsequent transfer had been recorded. The evidence also demonstrated that Respondent had requested at least twice that deeds be prepared, though neither was ever executed or recorded. Both of those draft deeds were prepared *after* Respondent agreed to take all responsibility for the Property in 1992 (as well as the year 2000 document indicating that agreement) and *after* the Ohanas' 1995 bankruptcy proceeding, during the

---

**13.** The Court of Special Appeals's unreported opinion notes Respondent's supplying as a "postscript" in his reply brief the information that case number 24C09006812 in the Circuit Court for Baltimore City imposed a constructive trust upon the property. Further, Mr. Ohana "was ordered to convey to appellant all right, title, and interest that he had in the property, personally and on behalf of EI Associates." The Maryland Judiciary Case Search website reflects that the case is captioned *"Ephraim Ohana v. Isaac Neger, et al."* and that the matter was closed on January 13, 2011 by Settlement Order.

period when Respondent believed he had an equitable interest in the property. Neither of those deeds, however, actually purported to transfer the title from Ohana and EI Associates (the 1990 grantees) to Respondent himself, in order to marry Respondent's equitable interest with the record, legal ownership of the Property. The trial court was entitled to credit this evidence and draw reasonable inferences therefrom, including that Respondent acted with the intent to defraud in order to serve his own interests.

The trial court's second reference to "good faith" comes near the end of the court's findings. The court explains: "And [Respondent's] belief, even if it was a good faith belief that this was his property, that it had always been his property, that he'd paid for the property, does not dissipate the intent to do—the intent to have a deed filed which was altered in a material way." This statement does not reflect a finding by the trial court that Respondent acted in good faith, particularly in light of the previous findings regarding Respondent's knowledge that record title to the Property, despite any equitable claim he had, was not vested in him. Rather, the statement first describes "good faith" in the conditional ("*even if* it was . . . ."), and then describes why Respondent may have believed he had an equitable interest in the property, not legal title. Moreover, the trial court's earlier findings make clear that Respondent indeed knew that legal title was not vested in him and an executed deed was the way to transfer legal title. Thus, the court's discussion regarding Respondent's "good faith belief" could not negate his intent to defraud the system, including any individual who would later access the recorded deed, because, by materially altering the executed deed, he sought to convey to the public, although he knew otherwise, that he was the record owner of the Property. This does not demonstrate that Respondent acted with good faith when he altered the grantor and grantee and forged the attorney's signature, as the trial court found Respondent did.

### III.

In sum, CR § 8–601 requires that a defendant act with the specific "intent to defraud another," which does not require

the State to prove that the defendant intended to defraud any particular person. The trial court's finding that Respondent acted with the intent to defraud the system of deed recordation inherently reflects the intent to defraud anyone, including subsequent purchasers and creditors, who would later seek to rely on the accuracy of the counterfeit deed. Finally, although good faith is generally a defense to a crime requiring the specific intent to defraud, the trial court's findings do not reflect that Respondent acted with the good faith belief that he was the record owner of the Property. Instead, the trial court determined that Respondent knew that the title to the Property remained as originally titled in 1990, but he sought to remedy that on his own accord by materially altering a previously executed deed that would have transferred the property to E.I. Associates.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED. COSTS IN THIS COURT AND IN THE COURT OF SPECIAL APPEALS TO BE PAID BY RESPONDENT.**