REPORTED

<u>IN THE COURT OF SPECIAL APPEALS</u>

<u>OF MARYLAND</u>

No. 1855

September Term, 2014

_____

PHILLIP MARTIN,

v.

TWP ENTERPRISES INC.

_____

Krauser, C.J.,
Berger,
Leahy,

JJ.

_____

Opinion by Leahy, J.

_____

Filed: February 24, 2016

This appeal springs from the collapse of Best & Brady Components, LLC ("Best & Brady")—a lumber manufacturing company that opened for business in March of 2010. Phillip Martin ("Martin" or "Appellant") was a minority owner and assumed management of Best & Brady's daily operations under a two-year employment contract. Immediately after its formation Best & Brady encountered numerous problems and began losing money. Best & Brady was never profitable, and, by May 2011, ran out of cash. Shortly thereafter, TWP Enterprises, Inc., ("TWP" or "Appellee") bought the ephemeral company's assets.

On October 7, 2013, Martin filed a complaint in the Circuit Court for Montgomery County, Maryland, against Best & Brady and TWP seeking unpaid wages and compensation under his employment contract.[1] After obtaining a default judgment against Best & Brady,[2] Martin pursued TWP for satisfaction of the judgment. The circuit court held a bench trial on August 5 and 6, 2014, on the sole issue of TWP's successor liability. Martin claimed that TWP was a mere continuation of Best & Brady and, therefore, liable

---

[1] Martin's complaint included a claim for back wages and treble damages under the Maryland Wage Payment and Collection Act, Maryland Code, Labor and Employment ("L&E"), § 3-501 *et. seq.* However, Martin does not raise a statutory wage issue in this appeal. Instead, he exclusively argues the merits of successor liability for failure to pay compensation due him for the alleged breach of his employment contract. In his brief, Martin states that "[s]ince [his] termination was without cause, the employment agreement required Best & Brady to continue paying Martin $10,000 per month." TWP nevertheless asserts on appeal that the guaranteed payments Martin seeks are not subject to the private remedies in L&E § 3-507.2. Martin did not file a reply brief and, therefore, we do not reach the wage claim in this appeal. *Harrison v. Harrison*, 109 Md. App. 652, 674 (1996) (stating that this Court will not generally decide issues that have not been raised on appeal).

[2] A State Department of Assessments and Taxation (SDAT) document contained in the record states that Best & Brady is a limited liability company, formed on February 25, 2010, and was still in good standing "on this February 28, 2014."

under the "mere continuation" exception to the general rule that successor corporations do not assume the liabilities of selling corporations. The circuit court disagreed, finding that TWP is not a mere continuation of Best & Brady and, therefore, was not liable for the default judgment against Best & Brady.

Maryland law establishes that the function of the "mere continuation" exception is to prevent corporations from purchasing assets solely for the purpose of placing those assets out of the reach of the predecessor's creditors. We hold that a court may consider the purpose of the asset sale and the adequacy of consideration as additional factors in its analysis of whether the "mere continuation" exception should apply. We affirm the circuit court's determination in this case that TWP is not a mere continuation of Best & Brady.

## BACKGROUND

Martin is the third-generation owner of a family lumber distribution business, Best Building Components, LLC ("BBC"). Headquartered in Maugansville, Maryland, BBC distributes lumber and sells home heating oil wholesale. Before 2010, BBC also manufactured roof trusses and other engineered wood products ("EWP").[3] TWP, a Maryland stock corporation formed in 1999, is a retailer of lumber and hardware in the greater Washington, D.C. Metropolitan area and was a customer of BBC.

---

[3] In its memorandum opinion and order in the underlying case, the court found that a "roof truss" is "a wooden frame around which a home's roof may be built. Constructing a truss requires lumber, machinery to cut the lumber, steel plates, and design know-how, among other things."

2

## Prior Negotiations

Martin testified during the trial held on August 5 and 6, 2014, that, in 2009, he entered into discussions with the President and CEO of TWP, Michael Cassidy ("Cassidy"), and the Treasurer, James Twigg ("Twigg"), about forming a business partnership for the dual purpose of providing support for Martin, whose EWP business was not showing a profit following the 2008 collapse of the housing industry, and developing a reliable source of EWP and roof trusses for TWP. In early November 2009, the parties signed an "Outline Letter," or letter of intent, which was amended to reflect that TWP and Martin had agreed to involve Jeff Brady, principal owner of Brady Fabrications, Inc., another roof truss manufacturer, in the discussions and negotiations.

On December 7, 2009, the parties exchanged an "Acquisition Term Sheet" for TWP and BBC. The Acquisition Term Sheet evidenced TWP's intent to assemble assets purchased from BBC, assets of TWP, and "potentially others" and combine them to form a new limited liability company that would eventually become Best & Brady. TWP would contribute money to the venture through Truss Investors, LLC ("Truss")—a newly formed, wholly-owned subsidiary of TWP.[4] Because a number of Martin's customers were lumber companies that competed with TWP, TWP "disguised" its involvement in the business venture by creating Truss. Through its subsidiary, Truss, TWP would purchase certain assets from Martin and BCC, among others, and operate Best & Brady out of Woodbine,

---

[4] Truss was registered in Maryland as a limited liability company on February 25, 2010. According to the Operating Agreement, TWP was the company's sole member.

Maryland, which was the location of Brady Fabrication, Inc. Truss would own the majority interest in Best & Brady, and Martin was to be an employee.

## Terms of Employment

The terms of Martin's employment with Best & Brady were set out in an offer letter a few weeks before the company was formally created. The offer letter from Cassidy, TWP's President and CEO, was dated February 1, 2010, and was countersigned by Martin in March 2010. The letter guaranteed Martin's employment of a "part time nature" for two years following "closing" on the purchase of BCC's and Brady Fabrication's assets.[5] Martin was to receive a monthly salary of $10,000.00 over the two-year period. Martin's principal objective was to integrate the roof truss manufacturing and EWP businesses of BBC and Brady Fabrications into Best & Brady. Thus, his responsibilities included maintaining customer relationships, securing ongoing business, developing and growing ongoing sales relationships, maintaining ongoing distributor relationships, developing a marketing plan, supervising staff, and implementing an annual strategic business planning process. The offer letter also allowed Martin to act as a "purchasing agent" and to supply wood from his wholesale lumber business for the roof truss plant.

The offer letter also addressed the requisites of a termination:

> In the event that Best & Brady Components terminates you prior to 24 months following the closing without cause, Best & Brady will continue to pay the terminated individual a monthly amount of $10,000 less taxes and other withholding required by law, until such a time as the second year would have been completed. If you are terminated for cause, which will be

---

[5] The assets were purchased in March 2010, and therefore, Martin's 24-month employment term was to run from March 2010 through February 2012.

4

narrowly defined . . . neither Best and Brady nor TW Perry will have any obligation to pay the remainder.

The offer letter further stated:

> For the purposes of clarity, nothing in this letter, nor in any other written or unwritten policies or practices of the Company create, nor are they intended to create an express or implied contract, covenant, promise, or representation of continued employment, nor of any particular assignment or position, for any employee. Employment with the Company is "at-will," which means that employment may be terminated at any time at the option of either the employee or the Company for any reason not prohibited by law. No officer, manager, supervisor, employee, or representative of the Company other than the President and the CEO, has the authority to change the at-will nature of the employment relationship and then, only in writing.

### BBC Assets Purchase

In March 2010, Martin, as sole shareholder of BBC, entered into an "Asset Purchase Agreement" for the purpose of selling BBC's assets to Best & Brady. Best & Brady agreed to purchase various assets of BBC, including trucks and equipment, inventory, intellectual property, and customer lists and records, for a sum of $139,570.00, payable in cash and a 7.5% membership interest in Best & Brady. BBC would continue to operate, and Martin agreed to change BBC's name to one "not. . . confusingly similar" to "Best Building Components, LLC."

As evidenced by the written integration plan provided on TWP letterhead, Best & Brady was an integration of Brady Fabrications, Inc., and BBC. Martin testified that, following the integration Best & Brady's "back office" operations—including accounting, hiring, IT, credit checks, and payroll—were conducted in large part by employees of TWP,

who were paid by TWP.[6] Martin managed Best & Brady's sales force and occasionally referred to himself as "President" of Best & Brady.

### The Operating Agreement

Best & Brady's Operating Agreement, effective March 9, 2010, established two classes of members for Best & Brady. "Class A" members consisted of Martin, Brady, and Dave Walstad (a third potential investor who later decided not to participate in the venture). Martin owned 7.5%, Brady owned 10%, and Walstad was to own 2.5% of Best & Brady. Truss was the sole "Class B" member, owning an eighty percent interest in Best & Brady. All class members agreed to contribute cash and assets to Best & Brady in exchange for their membership interests.

Under the Operating Agreement Truss was authorized to set the number of managers of Best & Brady, and had the "exclusive right" to designate or replace at-will managers. Advance written consent of Truss was required for any significant management decisions for Best & Brady, which Truss had "sole and absolute discretion" to make. Best & Brady's managers were Martin, Brady, Cassidy, Twigg, and Gary Bowman ("Bowman"). Cassidy, Twigg, and Bowman were senior employees or officers of TWP.

---

[6] Cassidy testified that TWP was supposed to be compensated $3,000.00 per month for providing administrative support to Best & Brady; however, Best & Brady was never able to pay TWP.

**Failing Fast**

Best & Brady encountered a number of problems following its start up in March 2010.[7] Best & Brady had difficulty completing orders on time and had to subcontract orders out to other distributors. On September 30, 2010, management met at TWP offices to discuss "firm revenue projections," "plans to increase revenues," immediate cost-cutting options, and "operational improvements." Best & Brady brought in Henry Whitlow, a business consultant, to provide suggestions for improving sales.

Around this time, Best & Brady's managers, including Martin, discussed a reduction in all salaries. On October 13, 2010, Martin sent Cassidy a chart showing, among other salary cuts, a 20% pay cut for his base salary. In October 2010, Martin's pay was cut $4,670.00 per month, and, although Martin attempted to negotiate a note for the deficit, no note was ever created. It is unclear from the record how long the pay cut lasted. However, in January 2011, Cassidy e-mailed Twigg and Martin stating that he talked to Martin that day about cutting Martin's pay again and allowing him to recoup the balance conditioned on Best & Brady's ability to pay off its expenses. In response, Martin agreed to "sunset" a portion of his salary, but he disagreed that recouping the balance could be made conditional on Best & Brady's "'performance' issues." Martin cited his employment agreement and argued that the "wording puts the ultimate payment of the 10,000 x 24 out of the reach of 'performance' issues as long as Best & Brady exists to pay it, these payments (even if deferred) are the obligation of Best & Brady."

---

[7] The following information comes from a memorandum Martin wrote about the history of Best & Brady, which TWP admitted as evidence in the circuit court.

7

In March 2011, Truss and several TWP senior employees lent Best & Brady $425,000.00. Despite this loan, Best & Brady ran out of cash by the end of May, and no party was willing to provide the company an additional infusion of capital. In May 2011, TWP began absorbing additional accounting and administrative costs, as well as a percentage of the labor costs. Around that time, the managers of Best & Brady—including Martin, Brady, Cassidy, and Twigg—met to consider numerous options, including bankruptcy and orderly liquidation of the business. Martin was strongly opposed to filing for bankruptcy because Best & Brady owed Martin approximately $300,000.00 as a trade creditor through his company BBC.

On May 25, 2011, in order to cut costs further, Cassidy requested the names of Best & Brady employees that could be let go. On May 31, after the above mentioned manager's meeting that Martin attended, a list was provided to Cassidy with Martin's name that stated he was "[n]o [l]onger employed with Best & Brady- Phil [Martin] is already aware of this." There is disagreement in the record as to whether Martin voluntarily resigned during the meeting or whether Martin, as he claims, was fired. Martin continued selling materials for Best & Brady as a commissioned salesman and acting as its vendor. Martin testified that he no longer attended management meetings.

**Best & Brady Assets Purchase**

A few months later Best & Brady management made the decision to sell the assets of the failing company to TWP. On August 31, 2011, Martin and Brady both signed a "Certificate and Consent of Members and Release." The document provided that Martin

8

would resign as an officer and co-manager of Best & Brady, transfer all of his membership interest to Truss, and that:

> Notwithstanding anything to the contrary contained in the Organizational Documents, the Members hereby authorize the Company to (i) transfer all of its assets to [TWP] in exchange for TWP's assumption of all outstanding debt of the Company as set forth on Exhibit "A" attached hereto; and (ii) execute and deliver such assignments, bills of sale, documents and other agreements . . . to effectuate the transfer.

The "Bill of Sale," effective August 31, 2011, signed by Cassidy, Martin, Brady, Twigg, and Bowman, encapsulated the parties' agreement to assign certain "Purchased Assets" from Best & Brady to TWP. Among those purchased assets were equipment and tangible assets, rebates due from all vendors, all contracts, claims and rights relating to or arising out of the business, and all customer lists, customer records and information relating to the business. The "Liabilities Assumed" as set forth in "Schedule A" included accounts payable, line of credit, taxes payable, accrued liabilities and note payable equipment. Ultimately, TWP assumed $1,162,160.00 in liabilities, including approximately $300,000.00 owed to Martin as a trade creditor.

> In its memorandum opinion, the court summarized what occurred next:

> TWP continued in the business of truss design and manufacture, operating from Woodbine, Maryland. For a time, it did business as "Best and Brady" or "B&B." Mr. Brady became an employee of TWP but not an owner. TWP continued to provide "back office" support. TWP no longer had an in-house sales staff for the truss business and relied on independent salesmen of which [Martin] was one. Mr. Butcher no longer supervised the independent salesmen. Some of BBC's former employees now worked for TWP. TWP sold to some of the same clients, some of whom had been transitioned to B&B from BBC. TWP continued to use the same software as [Best & Brady] and the same sales report format. Martin continued to be a vendor to TWP.

9

**Martin's Compensation Claim**

During his employment with Best & Brady, Martin received $78,153.79 in regular salary in 2010, and $45,476.27 in regular salary in 2011. In 2011, Martin received an additional $20,005.52 from Best & Brady as compensation for his commissioned sales. In 2012, Martin received an additional $20,080.34 from TWP as compensation for his commissioned sales.[8] Martin received a total of $163,715.92 in compensation from Best & Brady or TWP from 2010 through 2012. However, Martin testified that he was only willing to credit Best & Brady for compensation he received during the 24 month period outlined in his employment agreement.[9] According to Martin's computations, the compensation he received during this time totaled to $147,169.51, leaving $92,830.49 remaining of his claim from the $240,000 compensation guaranteed in his employment agreement.

**The Complaint**

On October 7, 2013, Martin filed a complaint against Best & Brady and TWP, alleging in Count I that Best & Brady violated the Maryland Wage Payment and Collection

---

[8] Martin's complaint, filed in the circuit court on October 7, 2013, states that the Defendants (TWP and Best & Brady) stopped paying Martin in "the middle of 2012," which resulted in his termination.

[9] Martin's offer letter states, "Employment will be on a part time basis following the Closing, and will be guaranteed for 2 years following the closing." Closing took place on March 25, 2010, according to the Asset Purchase Agreement, signed by BBC, Martin, and Best & Brady. It is not clear in the record why Martin did not include the compensation he received for commissioned sales in March 2012 in his calculation of his wage claim against Best & Brady.

Act. Martin claimed that Best & Brady violated the Act by (1) unilaterally reducing his wages without his written consent or any other authorization, and (2) failing to pay him the wages due to him under the Agreement. Martin sought treble damages amounting to $279,000.00.

In Count II Martin alleged Best & Brady breached the Employment Agreement by failing to pay him the guaranteed compensation due and demanded $93,000.00 in compensatory damages. In Count III, Martin claimed that TWP was liable for Best & Brady's violation of the Act under the "theory of successor liability" because TWP was a mere continuation of Best & Brady. TWP filed an answer on December 10, 2013, denying any obligation to pay Martin and reserving the right to plead any defenses available to Best & Brady if TWP was found liable.

Following notice from Montgomery County Circuit Court that Best & Brady had not filed an answer or request for default—Martin filed a motion for an order of default against Best & Brady, which was granted by the Circuit Court for Montgomery County on January 10, 2014. Following an *ex parte* hearing, the court entered an order of judgment on March 12, 2014, in favor of Martin against Best & Brady, in the principal sum of $278,490.00 with interest in the sum of $11,064.24.

On March 14, 2014, TWP filed a motion for summary judgment, arguing that there was no genuine dispute as to any material fact and that TWP was entitled to judgment as a matter of law. Martin filed an opposition to the motion on April 1, 2014 and the court denied summary judgment on April 8, 2014.

11

On June 13, 2014, TWP filed a memorandum before trial arguing that (1) TWP is not a mere continuation of Best & Brady and, therefore, is not liable to Martin, (2) Martin is estopped from pursuing his claim because he agreed to modify his contract when he actively participated in the sale of Best & Brady, and (3) "Martin is not entitled to treble damages under Md. Code, L&E § 3-507.2 because the bulk of his claim is for breach of contract damages, not wages, and because the wage component was withheld in good faith." On July 28, 2014, Martin filed his own memorandum before trial, arguing that, because TWP continued operating Best & Brady after the purchase from the same location, with the same employees, under the same trade name, that TWP was a mere continuation of Best & Brady and assumed the liabilities of Best & Brady.

At trial Martin testified that after the completion of the sale he had no way of knowing what happened to Best & Brady; however, he claimed there was no noticeable change in the operation of Best & Brady. Martin offered the testimony of Gregory Martin (no relation to Martin), a self-employed roof truss salesman and co-owner of BBC. Gregory Martin was hired as an employee of Best & Brady in March of 2010 as a road salesman. He was employed by Best & Brady as a commissioned salesman at the time of the asset sale between Best & Brady and TWP. Gregory Martin testified that there was no announcement that Best & Brady was under new ownership or management, operations of Best & Brady remained the same, Best & Brady's name appeared on the vehicles used by the company, and all paperwork continued using the Best & Brady name and logo. However, during cross-examination, Gregory Martin admitted that the checks he received "had a different name," and he began receiving tax forms from TWP.

12

Martin examined Edward Quinn, the majority owner and chairman of TWP, who had stated in his deposition that he thought Best & Brady still existed. However, during testimony, Mr. Quinn clarified that "[t]he line of business continues. The entity is different." Mr. Quinn testified that the ownership structure, operation, and management had changed, with Brady taking over as general manager. Cassidy further clarified that the roof truss business had become a "new division inside of [TWP]." Cassidy and Brady acknowledged a change in management from Martin to Brady after the asset sale to TWP.

The trial judge entered her opinion and order on September 29, 2014, concluding that "Martin has demonstrated no basis upon which to hold TWP liable for non-payment of wages or breach of contract by [Best & Brady]." After observing the general rule that a corporation that acquires the assets of another corporation is not liable for the debts and liabilities of the predecessor corporation, the court noted that it was "not persuaded that the 'mere continuation exception' applie[d] to affix liability on TWP." The court's opinion was based on its findings that (1) there was no evidence that the transaction was for the purpose of avoiding liability to Martin; (2) TWP provided Best & Brady adequate consideration; and (3) while there was substantial overlap in management, control, and ownership, this overlap was not determinative "given the degree of overlap that always existed between Best & Brady and TWP."[10] Martin filed a notice of appeal on October 28, 2014.

---

[10] The court did not make a factual finding on the issue of whether Martin resigned voluntarily or was fired, stating merely that Best & Brady "switched three employees, including Plaintiff, to commissioned sales status…."

13

Martin presents the following issues on appeal, which we have reworded slightly for clarity:[11]

I. Did the trial court err by applying the fraud exception rather than the "mere continuation" exception to the general rule that a successor corporation is not liable for the debts and liabilities of its predecessor corporation?

II. Did the asset purchase by TWP of its own subsidiary, Best & Brady, and continuation of TWP under the same or similar management as Best & Brady, impose liability upon TWP for Best & Brady's debts under the "mere continuation" exception?

_____

[11] TWP presents two additional issues for our review:

I. Whether Martin is equitably estopped from pursuing a claim of successor liability against TWP, where Martin participated in and benefitted from the sale of Best & Brady's assets to TWP?

II. Whether, if TWP is liable to Martin, Martin's claim is subject to enhanced damages and fee-shifting provisions of Md. Code Ann., L&E § 3-507.2, where the bulk of his claim is for breach of contract damages, no past-due wages, and where TWP's asserted liability is based solely on the disputed mere-continuation theory?

Martin does not raise the statutory wage issue on appeal and TWP did not file a cross appeal, therefore, we do not reach TWP's additional questions regarding estoppel and the Maryland Wage Payment and Collection Act. We note that TWP asserts the following in its briefing regarding the wage claim, to which Martin filed no reply:

Assuming without conceding, that [Martin] was fired without cause effective May 31, 2011, he should have received nine additional months of guaranteed payments, or $90,000. Instead, he received commissions from Best & Brady and TWP totaling $40.013.86. That leaves $49,986.14 as breach of contract damages for early termination of his contract, which is not subject to the private remedies in L&E § 3-507.2.

## DISCUSSION

### Standard of Review

On appeal of an action tried without a jury, an appellate court is bound by the circuit court's findings of fact unless they are clearly erroneous. Md. Rule 8-131(c); *see also Cunningham v. Feinberg*, 441 Md. 310, 321-22 (2015). The trial court's legal determinations and conclusions of law typically receive no deference and are reviewed *de novo*. *See Shih Ping Li v. Tzu Lee*, 437 Md. 47, 57 (2013); *State v. Neger*, 427 Md. 582, 595 (2012). However, where the mixed question of law and fact has a heavier factual component, as does the case at hand, it is subject to a "clearly erroneous" review. *Farmers Bank of Maryland v. Chicago Title Ins. Co.*, 163 Md. App. 158, 188 (2005) (citing *State v. Jones*, 103 Md. App. 548, 590 (1995) *rev'd on other grounds sub nom. Jones v. State*, 343 Md. 448 (1996)).

Application of the "mere continuation" exception to the general rule against successor liability requires an examination of the corporate entities involved, including a factual comparison of the selling corporation to the purchasing corporation. *See* 1 Fletcher Cyc. Corp. § 48 ("In determining whether a successor corporation is an alter-ego of a former corporation and thus liable for the former corporation's debts and liabilities, a court may analyze the following factors with respect to the two entities: (1) centralized control of labor relations; (2) common management; (3) interrelation of operations; and (4)

common ownership and financial control.").[12]   The circuit court's determination of successor liability and the applicability of the "mere continuation" exception is a mixed question of fact and law, with a heavier factual component, entailing review by this Court for clear error.

**Successor Liability**

Generally, "a corporation which acquires the assets of another corporation is not liable for the debts and liabilities of the predecessor corporation." *Baltimore Luggage Co. v. Holtzman*, 80 Md. App. 282, 290 (1989); *see also Ramlall v. MobilePro Corp.*, 202 Md. App. 20, 34-35 (2011); *Smith v. Navistar Intern. Transp. Corp.*, 737 F. Supp. 1446, 1448 (D. Md. 1988); 15 Fletcher Cyc. Corp. § 7122 (2015) ("The general rule, which is well settled, is that where one company sells or otherwise transfers all of its assets to another company, the latter is not liable for the debts and liabilities of the transferor."). This general rule has applied, where asset transfers were made in good faith for fair consideration, to foreclose actions for damages for breach of contract. *Id*.

We recognize four exceptions to the general rule.   In Maryland, the predecessor corporation's debts and liabilities become the obligation of the successor corporation when:

---

[12] *See* 1 Fletcher Cyc. Corp. § 48 (2015) ("Whether a successor corporation is the alter ego of its predecessor is a question of fact."); *see also* 15 Fletcher Cyc. Corp. § 7329 (explaining that a successor is a "mere continuation" of a predecessor corporation where, in spite of creating a new corporation in law, the circumstances attenuating the creation of the new corporation indicate that it is "in reality a mere continuation of the old."); 15 Fletcher Cyc. Corp. § 7122 ("Before a decision can be made regarding liability, many facts and policy factors must be weighed in the balance, and the policy protecting corporate creditors must be weighed against the equally important policy respecting separate corporate entities.").

(1) there is an expressed or implied assumption of liability; (2) the transaction amounts to a consolidation or merger; (3) the purchasing corporation is a mere continuation of the selling corporation; or (4) the transaction is entered into fraudulently to escape liability for debts.

*Baltimore Luggage*, 80 Md. App. at 290 (internal citations omitted); *see also Nissen Corp. v. Miller*, 323 Md. 613, 617 (1991). The gravamen of these exceptions is the protection of creditors' rights upon a transfer of assets. *Baltimore Luggage*, 80 Md. App. at 297.

The first exception, applicable where the successor corporation either expressly or impliedly assumes liability, is codified in part and recognized in Maryland case law. The "express" prong of the first exception is codified at Maryland Code (1975, 2007 Repl. Vol.), Corporations and Associations ("C&A"), § 3-115(c)(1), which provides that "the successor is liable for all debts and obligations of the transferor to the extent provided in the articles of transfer."[13] The "implied" prong was first recognized in *Isle of Thye Land Co. v. Whisman*, a case in which the Court of Appeals determined that a successor corporation can impliedly assume liability, under certain circumstances, for a contractual obligation of a predecessor corporation. 262 Md. 682, 706-07 (1971). In *Isle of Thye*, the articles of transfer evidencing the sale of all of the predecessor corporation's assets to the successor corporation was never filed with the State. *Id.* at 706. Yet the Court of Appeals determined that the successor corporation was still liable under a land sale contract entered

---

[13] Citation to the 2007 Supplement reflects the statute at the time that the complaint was filed in this case. The current statute is codified without change in the 2014 replacement volume, at Maryland Code (1975, 2014 Repl. Vol.), C&A, § 3-115(c)(1) and (2).

17

into by the predecessor where, *inter alia*, the successor corporation "attempted to exercise options reserved under the contract . . ." to acquire additional land.  *Id*. at 707.

The second exception, applying to circumstances involving a consolidation or merger, is codified at C&A § 3-114(f)(1).[14]   In *Ramlall v. MobilePro Corp.*, we observed that, where two corporations are merged, the legislature has made clear that the resulting corporation remains liable for "all debts and obligations of each nonsurviving corporation." 202 Md. App. 20, 34-37 (2011) (quoting C&A § 3-1147(f)(1)).

The fourth exception, aimed at the fraudulent transfer of assets, is codified at Maryland Code (1975, 2013 Repl. Vol.), Commercial Law ("Comm."), §§ 15-201 *et seq.* respectively.[15]   This exception was applied in the seminal case, *Colandrea v. Colandrea*,

---

[14] C&A § 3-114(f)(1) states:

§ 3-114. Effect of consolidation or merger.

(f) *Successor liable for debts and obligations*. — (1) The successor is liable for all the debts and obligations of each nonsurviving corporation, partnership, limited partnership, limited liability company, and business trust.  An existing claim, action or proceeding pending by or against any surviving corporation, partnership, limited partnership, limited liability company, or business trust may be prosecuted to judgment as if the consolidation or merger had not taken place, or, on motion of the successor or any party, the successor may be substituted as a party and the judgment against the nonsurviving corporation, partnership, limited partnership, limited liability company, or business trust constitutes a lien on the property of the successor.

[15] Comm. § 15-201 *et. seq.* provides in pertinent part:

§ 15-205. Conveyance by person in business.

18

42 Md. App. 421 (1979), in which Mrs. Colandrea syphoned valuable assets from the predecessor corporation that she and her husband founded, to a new company she started following their divorce, leaving the predecessor corporation without sufficient assets to satisfy its debt to her ex-husband. *Id.* at 432-33. This Court determined there was a fraudulent conveyance satisfying Comm. § 15-207, where, coupled with Mrs. Colandrea's intent to defraud, the predecessor corporation paid the operating expenses of the successor corporation for the first year without receiving any consideration. *Id.* at 438-39. The Court disregarded the corporate entity of the predecessor corporation and held the successor corporation liable for the debt to the ex-husband. *Id.* at 439.

The third exception has not been codified in Maryland. Our common law directs that the "mere continuation" exception applies to hold liable "the purchasing corporation [that] maintains the same or similar management and ownership but wears a 'new hat.'" *Baltimore Luggage, supra*, 80 Md. App. at 297 (quoting *Bud Antle, Inc. v. Eastern Foods,*

---

Every conveyance made without fair consideration when the person who makes it is engaged or is about to engage in a business or transaction for which the property remaining in his hands after the conveyance is an unreasonably small capital, is fraudulent as to creditors and other persons who became creditors during the continuance of the business or transaction without regard to his actual intent.

§ 15-207. Conveyance made with intent to defraud.

Every conveyance made and every obligation incurred with actual intent, as distinguished from intent presumed in law, to hinder, delay, or defraud present or future creditors, is fraudulent as to both present and future creditors.

*Inc.*, 758 F.2d 1451, 1458 (11th Cir. 1985)). The exception permits recovery against the successor corporation where the successor is essentially the same corporate entity as the predecessor corporation. The exception is "designed to prevent a situation whereby the *specific purpose of acquiring assets* is to place those assets out of reach of the predecessor's creditors." *Id*. (Emphasis added). We turn now to examine Appellant's questions and the theory of liability underlying this third exception as first applied in *Baltimore Luggage*,[16] and further developed in *Nissen Corporation v. Miller*, 323 Md. 613 (1991), and *Academy of IRM v. LVI Environmental Services, Inc.*, 344 Md. 434 (1997).

## I.

### Factors Considered Under the "Mere Continuation" Exception

The circuit court found that the purpose of Best & Brady's sale of assets to TWP was not to place the assets beyond Martin's reach, but rather to "salvage . . . a failing

---

[16] Although it was not adopted prior to *Baltimore Luggage*, the "mere continuation" exception was acknowledged in *Bart Arconti & Sons, Inc. v. Ames-Ennis, Inc.*, 275 Md. 295, 313 (1975), and *Colandrea*, 42 Md. App. at 435. Both cases cite language from *Stanford Hotel Co. v. M. Schwind Co.*, 181 P. 780, 783 (Cal. 1919), quoting:

> [T]hat "where a new corporation reorganizes under a new name, but with practically the same stockholders and directors, and continues to carry on the same business, a court of equity will regard the new corporation as a continuation of the former corporation, and will hold it liable for the debts of the former corporation."

*Arconti*, 275 Md. at 313; *Colandrea*, 42 Md. App. at 435. Both courts declined to find the successor corporation liable under this exception. *Arconti* stated summarily, "The short answer here is that neither of the two corporations are shown by evidence to be successors of Arconti." 275 Md. at 313. This Court in *Colandrea* determined that it could not distinguish the successor corporation in that case from the successor corporation in the *Arconti* case, and, therefore, the exception recognized in *Standford Hotel* could not apply.

business," and, therefore, the "mere continuation" exception did not apply. Martin argues that ascertaining the purpose of an asset sale is a function in applying the fraud exception—the fourth exception to the general rule against successor liability—and that, by examining the purpose, the circuit court improperly blended the "mere continuation" exception with the fraud exception in this case. Further to this point, Martin argues that the circuit court erred by examining the consideration involved and by determining that TWP's purchase of Best & Brady's assets was "not without adequate consideration." Martin contends that whether or not there was adequate consideration may be relevant in a fraudulent transaction exception analysis but should not be dispositive of whether the "mere continuation" exception applies. Martin asserts that the circuit court should have instead focused solely on the "continuation of the same or similar ownership and management of [Best & Brady] after the asset sale to TWP."

Defending the circuit court's decision, TWP argues that the court properly examined the purpose of the asset sale and accurately found that the sale was for the purpose of salvaging a failing business. TWP cites to *Baltimore Luggage*, 80 Md. App. at 297, which held that failure to consider factors beyond common management and ownership "is to disregard the separate identities of the corporation without the necessary considerations that justify such an action." Based on the holding in *Baltimore Luggage*, TWP contends that the circuit court correctly looked beyond the mere continuation of management and ownership to find that TWP was not liable for Martin's employment agreement with Best & Brady. We agree.

21

**The Weight of Consideration and the Purpose of the Transaction Are
Proper Factors in a "Mere Continuation" Analysis**

In Maryland, only three cases have addressed the "mere continuation" exception to the general rule against successor liability: *Academy of IRM*, 344 Md. at 451-57; *Nissen Corp.*, 323 Md. at 619-33; and *Baltimore Luggage*, 80 Md. App. at 296-99. In none did the Court conclude that the successor corporation was a mere continuation of the predecessor corporation.

In the leading case, *Baltimore Luggage*, Judge Rosalyn Bell, writing for this Court, explained that "the underlying theory of the ["mere continuation" exception] is that, if a corporation goes through a mere change in form without a significant change in substance, it should not be allowed to escape liability." *Baltimore Luggage*, 80 Md. App. at 297. Judge Bell instructed that the "indicia of continuation" are

> common officers, directors, and stockholders; and only one corporation in existence after the completion of the sale of assets. While the two foregoing factors are traditionally indications of a continuing corporation, neither is essential. Other factors, such as continuation of the seller's business practices and policies **and the sufficiency of consideration** running to the seller corporation in light of the assets being sold may also be considered.

*Id*. (citing 15 W. Fletcher, Cyc. Corp. (Cum. Supp. 1988). (Emphasis added). Judge Bell emphasized that "[t]o find that continuity exists merely because there was common management and ownership without considering other factors is to disregard the separate identities of the corporation without the necessary considerations that justify such an action." *Id*.

*Baltimore Luggage*, much like the case on appeal, involved the question of whether the successor corporation assumed certain obligations contained in an employment

22

agreement entered into between the predecessor corporation and its employee. *Id.* at 285-86. This Court determined that the successor corporation was not a "mere continuation" of the predecessor corporation because there was a change in ownership and management, the predecessor corporation continued in existence after the sale, and there was sufficient consideration for the purchase.[17] *Id.* at 298-99. Judge Bell observed that the fact that the owner of the predecessor corporation retained a minority interest in the successor corporation was not sufficient to make the successor corporation a mere continuation.[18] *Id.* at 298.

In *Nissen*, a products liability case, the Court of Appeals analyzed whether a successor corporation can be held liable under the "mere continuation" exception for injuries resulting from a defective treadmill manufactured by the predecessor corporation. 323 Md. at 615-20. The asset purchase agreement in *Nissen* expressly excluded assumption of liability for injuries arising from any product previously sold by the predecessor corporation. *Id*. at 615. Writing for the Court, Judge Howard S. Chasanow observed that "[t]here is no reason to believe that [the transfer of assets] was not an arm's length

---

[17] On motion for reconsideration, it became apparent that the predecessor corporation no longer existed by the time of the trial and the Court had been given false information. *Baltimore Luggage*, 80 Md. App. at 302-03. However, this Court held that its ultimate conclusion was not altered by this new information. *Id.* at 304.

[18] Although the Court in *Baltimore Luggage* did not overtly rely on whether the selling corporation's *purpose* was to commit fraud in holding that the "mere continuation" exception did not apply, it did conclude, in examining whether other exceptions to the general rule of nonliability applied, that there was no evidence to support the fraud exception. *Id.* at 291.

transaction or that [the predecessor corporation] did not receive and retain full value for its assets." *Id*. Thus, although the successor company did, for example, hire some of the predecessor corporation's employees, the circumstances surrounding the sale of assets in *Nissen* did not fall within any of the traditional exceptions to the rule of nonliability of corporate successors. *Id*. 616, 620. The Court of Appeals was, therefore, urged to adopt a fifth exception under the "continuity of the enterprise theory" in order to hold the successor corporation liable.[19] *Id.* at 621. The Court declined to adopt a fifth exception to the general rule of successor liability.[20] Judge Chasanow's explication of the distinction between the "mere continuation" exception and the "continuation of the entity" theory is instructive:

> The mere continuation of continuity or entity exception applies where 'there is a continuation of directors and management, shareholder interest and, **in some cases, inadequate consideration**. The gravamen of the traditional 'mere continuation' exception is the continuation of the *corporate entity* rather than the continuation of the business operation. . . . This exception focuses on the continuation of management and ownership. In contrast, the continuity of *enterprise* theory focuses on continuation of the business operation or enterprise where there is not continuation in ownership.

*Id.* at 618-20 (bold emphasis added) (quoting Frumer & M. Friedman, Products Liability § 2.06 [2][c] (1989); 1 *American Law of Products Liability*, § 7:14, at 30; 7:20 at 36).

---

[19] "'[A] continuity of enterprise analysis seeks to establish whether there is substantial continuity of pretrasaction and posttransaction *business activities* resulting from the use of the acquired assets[.]'" Nissen, 323 Md. at 620 n.1 (quoting 1 *American Law of Products Liability*. 3d. § 7:27, at 44 (Travers, Rev. ed. 1990) (emphasis in original).

[20] Although the holding in *Nissen* was limited to products liability, Maryland has not adopted continuation of the enterprise theory in any successor liability case. *See Academy of IRM*, 334 Md. at 452-54 (acknowledging that *Nissen* rejected the continuation of the enterprise theory and applying the continuation of the entity theory). Because Martin does not argue that this Court should adopt the continuation of the enterprise theory in this case, we do not reach whether the continuation of the enterprise could properly be adopted in cases seeking breach of contract damages from a successor corporation.

The most recent Maryland case to examine the elements of the "mere continuation" exception, *Academy of IRM v. LVI Environmental Services, Inc.*, *supra*, added an additional factor to its analysis—the *purpose* of the asset sale. 344 Md. at 451. In *Academy of IRM*, the Court of Appeals affirmed the reversal of the circuit court, holding that a successor corporation that acquired the assets of the predecessor corporation through a foreclosure of *bona fide* security interests purchased for value was not liable for the debts of its predecessor where: (1) no former shareholder held any ownership in the successor, (2) no shareholder of the predecessor became a director of the successor, (3) only two employees of predecessor were now employed by the successor, but were not "instrumental" in the transfer, and (4) adequate consideration was paid by the successor. *Id.* at 454, 457. The Court explained that the lower court erroneously applied the continuity of enterprise analysis rather than the "mere continuation" exception by focusing on whether the successor corporation operated out of the predecessor corporation's old site using the predecessor's former employees and equipment, "without examining whether there was a continuation of the entity." *Id*. at 451-52.

In addition to the factors analyzed in *Baltimore Luggage* and *Nissen,* the Court of Appeals also considered the purpose of the asset sale. *Id*. 453-54. The Court noted that "there [was] no finding by the circuit court that any aspect of the acquisition by [the successor] of the former assets of Debtor was fraudulent as to unsecured creditors." *Id.* The Court stated that, where the transaction was not fraudulent as to unsecured creditors, "successor entity liability does not lie." *Id.* In *Academy of IRM*, the Court was guided by a decision of the Supreme Court of Rhode Island, *Jackson v. Diamond T. Trucking Co.*,

25

241 A.2d 471 (R.I. 1968), employing "five criteria for imposing continuing entity liability."[21] *Id.* at 457. Although, in *Academy of IRM*, the Court of Appeals did not decide whether to endorse the five criteria, it did specifically apply two criteria—determining in that case that inadequate consideration and a common officer who was "instrumental" in the transfer were not demonstrated by the evidence. *Id.*

In *Jackson*, the Supreme Court of Rhode Island observed during its analysis of the "mere continuation" exception:

> . . . suppose that in *Parsons*, [successor corporation] had paid full consideration for the transfer of assets from [predecessor corporation] and further that [predecessor corporation] continued in existence as a holding company. In such case there would be no need or reason to pursue the new corporation despite the fact that there were common personnel and despite the fact the new corporation continued the business of the old.
>
> * * *
>
> In other words, the factual conclusion that the transferee corporation is a continuation of the transferor corporation does not inexorably lead to the legal conclusion that the transferee is therefore liable for its transferor's obligations. **Many facts and policy factors must be weighed in the balance, most importantly, the policy protecting corporate creditors must be weighed against the equally important policy respecting separate corporate entities.**

241 A.2d at 476-77. We also find the Supreme Court of Rhode Island persuasive in its analysis of the purpose and effect of the transaction when deciding whether to apply the

---

[21] The five criteria listed by the Supreme Court of Rhode Island were: "(1) transfer of corporate assets (2) for less than adequate consideration (3) to another corporation which continued the business operation of the transferor (4) when both corporations had a least one common officer or director who was in fact instrumental in the transfer . . . and (5) the transfer rendered the transferor incapable of paying its creditors' claims because it was dissolved in either fact or law." *Jackson*, 241 A.2d at 477.

"mere continuation" exception. It is clear that, even where a court has determined that the ownership and management of a corporation has continued, it may examine "other factors" to determine whether the policy reasons underlying the "mere continuation" exception are served by finding successor liability. *Baltimore Luggage*, 80 Md. App. at 297. "[O]ther factors" considered by this Court and the Court of Appeals in *Academy of IRM* have included an analysis of whether applying the "mere continuation" exception would, in the transaction at issue, serve to prevent corporations from purposefully placing assets out of the reach of the predecessor's creditors. *See also* Md. Corp. L. § 9.10 ("The most important factors in determining whether the transferee is the "mere continuation" of the transferor are the ownership of the seller and the buyer and the *purpose of the transaction*." (Emphasis added)).

The Court of Appeals and this Court, in *Baltimore Luggage*, *Nissen*, and *Academy of IRM*, looked beyond the traditional indications of continuation—whether the purchasing corporation maintained the same or similar management and ownership as the selling corporation—to other factors that not only evidence the continuation of the corporate entity, but also examine the underlying purpose of the "mere continuation" exception. Taken together, these cases contain analysis of the following factors: (1) any change in ownership and management, (2) the continued existence of the selling corporation, (3) the adequacy of consideration, (4) the transfer of any "instrumental" employees from the predecessor to the successor, and (5) the purpose of the asset sale. *Academy of IRM*, 344 Md. at 452-57; *Nissen*, 323 Md. at 616, 621; *Baltimore Luggage*, 80 Md. App. 298-99. In all three cases, the Courts assessed the adequacy of consideration as a factor and

27

consistently found the exception did not apply where consideration was adequate, although none of the cited cases relied *solely* on the adequacy of consideration in their conclusions. *Academy of IRM*, 344 Md. at 457; *Nissen*, 323 Md. at 615-20; *Baltimore Luggage*, 80 Md. at 299.

In the case before us on appeal, the circuit court held that the "mere continuation" exception did not apply to "affix liability on TWP" after examining the management, control and ownership of the two corporations, and finding that purpose of the transaction was not to prevent creditors from accessing Best & Brady's assets and that there was adequate consideration (TWP assuming $1,162,160.00 of Best & Brady's liabilities). Indeed, the court noted that the decision to sell the assets to TWP, rather than declare bankruptcy, permitted Martin (a trade creditor for nearly a third of Best & Brady's outstanding liabilities) to receive approximately $300,000.00 in unpaid receivables. Although Best & Brady was then unable to pay Martin the difference between the $163,175.92 in compensation that he actually received, from the $240,000.00 that was contained in his offer letter from Best & Brady, the record is clear that Martin, as a creditor, was protected by the decision to sell the assets to TWP.

We hold that the circuit court did not err in examining the adequacy of consideration and the purpose of the asset sale in its analysis of the "mere continuation" exception to successor liability.

## II.

### A Mere Continuation?

Martin does not challenge the circuit court's factual findings, but contends that the court, considering all of the facts, erred when it failed to conclude that TWP was liable under the "mere continuation" exception.[22] Martin claims that TWP essentially owned Best & Brady because its subsidiary, Truss, held 80% of the company's stock. Thus, TWP's purchase of Best & Brady's assets amounted to a continuation of the entity through TWP's continued ownership and operation. To support this contention, Martin points to the following facts: (1) TWP continued to use the trade name "Best & Brady," (2) TWP continued to manufacture roof trusses and EWP at the Woodbine plant, (3) TWP retained the same employees and sold to the same customers, (4) TWP increased its ownership in the company from 80% to 100%, and, (5) TWP retained the same management, "including Cassidy . . . Brady . . . Jackie Shirk . . . and Thatcher Butcher." Martin asserts that the circuit court acknowledged these facts but "[d]espite these findings, the court refused to recognize the continuation of the entity . . . ."

The circuit court found that TWP was not liable to Martin for any non-payment of wages or breach of contract by Best & Brady for several reasons. The court examined the commonality of the officers, directors, and stockholders, finding that: Mr. Brady became

---

[22] Martin argued for the first time in his brief that the "consolidation or merger" exception would also allow this Court to hold TWP liable as the successor to Best & Brady. However, this argument was not preserved, *see* Md. Rule § 8-131(a) (2015), and Martin's counsel clarified during oral argument that he was only relying on the "mere continuation" exception on appeal.

an employee of TWP but not an owner; TWP continued to provide "back office" support; TWP no longer had an in-house sales staff for the roof truss business and relied on independent salesmen of which [Martin] was one; and Mr. Butcher no longer supervised the independent salesmen. The court concluded that, because both "before and after the asset sale" Best & Brady and TWP had "substantial overlap" in management, control, and ownership, such overlap was not determinative because "this is not an instance in which management of one stand-alone entity uses its authority merely to change 'hats' and manage a new stand-alone entity."

Relying on *Baltimore Luggage* and *Academy of IRM,* the court trained on the purpose of the asset transfer and concluded that "[t]he weight of the evidence shows that [Best & Brady's] decision to sell its assets to TWP was not merely a change of form for the purpose of placing these assets beyond [Martin's] reach as he pursued his claim for what remained of the $240,000 in guaranteed payments. Rather the decision to sell was an attempt to salvage what could be salvaged from a failing business." The circuit court noted that Best & Brady, a company that was never profitable, "considered bankruptcy, devised a plan to increase revenue and operations, hired a consultant, cut salaries across the board, and infused cash into the business," before deciding to sell its assets to TWP. This decision, the court found, benefitted Martin where TWP assumed nearly $1.2 million dollars of Best & Brady's liabilities, including approximately $300,000.00 owed to Martin as a trade creditor. And, the court found that by assuming nearly $1.2 million dollars of Best & Brady's liabilities, TWP provided Best & Brady adequate consideration for the asset transfer. Upon this factual predicate, the circuit court concluded that the "mere

30

continuation" exception did not apply in this case where there was no evidence of fraudulent purpose or inadequate consideration. We agree.

Initially, the facts do not necessarily demonstrate that TWP's purchase of Best and Brady's assets resulted in a continuation of the same corporate entity. Although there was overlap, ownership and management had also changed following the asset sale. Martin, who had referred to himself as the "President" of Best & Brady, was no longer an owner or manager, but continued on contract as a sales representative with TWP. Mr. Quinn testified that the ownership structure, operation, and management had changed, with Brady taking over as general manager of what Mr. Cassidy referred to as the "new division inside of [TWP]."

More importantly, the underlying purpose of the exceptions to the general rule would not be served if TWP were held liable for Best & Brady's obligations beyond what TWP had already agreed to assume under the Bill of Sale. The purpose of the exceptions to the general rule against successor liability is to protect the rights of creditors, enabling them to recover from the successor corporation. *Baltimore Luggage*, 80 Md. App. at 297. The evidence demonstrates that Martin, as owner of BBC, was protected by the decision to sell Best & Brady's assets to TWP. At the threshold of the Best & Brady joint-venture, the nascent company purchased assets from Martin's failing business, BBC, for the sum of $139,570.00. Martin then managed Best & Brady's sales, but the company had difficulty completing orders on time. Even the $425,000.00 loan from TWP senior employees and Truss could not break the company's fall. Martin actively opposed bankruptcy and eventually consented to the asset sale to TWP. Had Best & Brady filed for bankruptcy

31

rather than sell its assets, Martin likely would never have received the approximately $300,000.00 that TWP paid him as a trade creditor as part of the asset purchase deal.

Accordingly, we affirm the circuit court's finding that TWP is not a mere continuation of Best & Brady, and, therefore, is not liable to Martin for the default judgment he obtained against Best & Brady.

**JUDGMENT OF THE CIRCUIT COURT FOR MONTGOMERY COUNTY AFFIRMED. COSTS TO BE PAID BY APPELLANT.**